IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THE EQUAL RIGHTS CENTER,<br>Plaintiff | : | |
| v. | : | CIV. NO. AMD 06-1060 |
| EQUITY RESIDENTIAL, *et al.*,<br>Defendants | : | |

...o0o...

MEMORANDUM OPINION

Plaintiff Equal Rights Center ("ERC") is a Washington D.C.-based non-profit organization, having approximately 150 individual members. ERC's mission, *inter alia*, is to protect the rights of persons with disabilities through "education, counseling, advocacy, enforcement, and referral services." Many of its members are persons with disabilities. ERC instituted this action for injunctive and declaratory relief, and damages, against defendants Equity Residential, a real estate investment trust organized under the laws of Maryland (which describes itself as "one of the largest owners [of apartment buildings] in the United States") and ERC Operating Limited Partnership, an Illinois limited partnership owned and controlled by Equity Residential. Plaintiff alleges two claims. First, plaintiff sues under the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601-3619, as amended (hereinafter the "Fair Housing Act" or "FHA"). The gravamen of this claim is that defendants have engaged in a pattern and practice of violating the FHA in that they have "repeatedly and continually . . . failed to design and construct" properties subject to prescriptions of the FHA, i.e., multi-family properties containing the minimum number of

units and relevant features, so as to render the properties accessible to persons with disabilities. *See* 42 U.S.C. §§ 3004(f)(1), (f)(2), (f)(3). Similarly, in count two, plaintiff sues under the Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C. §§ 12181, contending that the properties at issue do not contain, in areas comprising "public accommodations," e.g., leasing offices, parking lots, sidewalks, and restrooms, certain features of minimum accessibility and adaptable design as required by law.

Defendants responded to the complaint by filing a motion to dismiss for lack of subject matter jurisdiction (that is, asserting that plaintiff lacks standing) and for improper venue. Defendants sought, in the alternative, a "severance" of what they assert are "multiple claims" and a "transfer of venue" of such severed claims to the numerous districts where the challenged properties are located. By order entered on March 12, 2007, I denied the motion. This Memorandum Opinion sets forth the reasons for that Order.

I.

It is well settled that, in considering a Rule 12(b)(6) motion to dismiss, a court must accept the well-pled allegations of the complaint as true and construe all facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). The court need not, however, accept conclusions of law or unwarranted deductions of fact. *See Mylan Lab., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1059 (D. Md. 1991). I remain mindful that "[t]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint," and not to resolve contests regarding facts, the merits of a

claim, or the applicability of defenses. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Accordingly, a Rule 12(b)(6) motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *See Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).[1]

II.

For purposes of the defendants' motion, the facts alleged in the complaint, together with the reasonable inferences therefrom, are taken as true.

Through various joint ventures, defendants develop, design, own, operate and/or manage certain multifamily housing dwellings nationwide, 300 of which comprise what plaintiff describes as the "Subject Properties" at issue in this action.[2] During 2005 and 2006, plaintiff inspected and tested 61 apartment complexes (referred to by the parties as the "Tested Properties") owned by Equity in seven states.[3] The inspections revealed violations at every Tested Property.

The "Subject Properties" share various combinations of design elements utilized in

[1]Although challenges to standing seem more appropriate as a challenge to subject matter jurisdiction asserted by motion under Fed.R.Civ.P. 12(b)(1), courts have examined standing under both rubrics.

[2]ERC alleges that 301 "Subject Properties" are at issue in this action. Defendants assert that only 299 properties are at issue. It appears that 300 is correct number.

[3]California, Florida, Massachusetts, New Jersey, Virginia, Washington, and the District of Columbia..

defendants' properties located in at least 15 other states.[4] These elements run the gamut in design and construction features and, plaintiff alleges, these features limit accessibility to persons with disabilities.[5] For example, according to the complaint: (1) interior doorways are too narrow to allow passage to persons in wheelchairs; (2) routes into and through units, kitchens and bathrooms are insufficiently spacious to allow wheelchair movement; (3) environmental controls and electrical outlets installed in living units are inaccessible; (4) slope grades of ramps hinder access to persons using wheelchairs; and (5) the properties contain inaccessible public spaces and common areas. Thus, plaintiff has alleged, in but two claims, a nationwide pattern and practice by defendants, which is allegedly on-going, in building and causing to be built, and owning and operating, properties whose design, construction and operation violate numerous prescriptions imposed by federal law.

Defendants, understandably wishing not to litigate a pattern and practice case that is nationwide in scope, filed their motion to dismiss, for severance, and to transfer venue, in which they (1) challenge the constitutional and statutory standing of plaintiff in the first instance, and, (2) alternatively, seek to defeat the litigation of plaintiff's pattern and practice

---

[4]The seven states mentioned above, plus: Arizona, Colorado, Connecticut, Georgia, Illinois, Maryland, Michigan, Minnesota, New York, North Carolina, Oklahoma, Oregon, Tennessee, Texas, Wisconsin.

[5]Plaintiff enumerates in detail precisely which of the 61 "Tested Properties" and 300 "Subject Properties" share various design elements. *See* Complaint ¶¶ 42-45. By way of example, 10 "Tested Properties" share common bathroom design elements (which allegedly violate federal requirements) both with each other and with 103 of the untested properties. *Id.* at ¶ 43. Another "Tested Property" contains kitchen design elements shared by kitchens in units at 12 of the untested "Subject Properties. *Id.*

claims.

III.

I first consider the issue of plaintiff's standing. To establish Article III standing, a plaintiff must allege facts which demonstrate: (1) the existence of a "concrete and particularized" injury-in-fact; (2) a causal connection between the injury suffered and the conduct complained of; and (3) that a favorable adjudication would redress the alleged injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Fundamentally, it is a *pleading* burden, *see FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231 (1990), although the court must be satisfied at all times that the requirement is met. Organizational standing under the FHA exists to the limits of constitutional "case or controversy" limits; prudential considerations play no role. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Thus, to allege a redressable injury-in-fact caused by defendants under the FHA, plaintiff need only allege facts that demonstrate that the defendants' actions either have caused the organization to divert resources to identify and counteract the defendants' unlawful practices, or that the challenged actions have frustrated plaintiff's mission. *Id.* at 378-79.[6] Here, plaintiff has plainly alleged such facts.

Nonetheless, defendants challenge plaintiff's standing, relying on the following contentions as indicia of an absence of plaintiff's standing: (1) plaintiff's mission is too

---

[6]In *Havens*, the Court stated that, where certain challenged practices "perceptibly impair[ed]" a plaintiff's "ability to provide counseling and referral services for low- and moderate-income home-seekers, there can be no question that the organization has suffered injury in fact." 455 U.S. at 378-79.

generalized for plaintiff to suffer a cognizable injury; (2) as a matter of law, plaintiff does not and cannot suffer a cognizable injury outside of the "Greater Washington Area;" and (3) plaintiff will not be entitled to relief on a nationwide basis.

None of these assertions defeat plaintiff's standing. First, plaintiff has amply alleged facts showing a causal connection between plaintiff's injury and defendants' conduct. Taking the allegations of the complaint as true, defendants own and/or operate 300 properties which, in one or more ways, limit access to persons with disabilities and thus violate federal law. Specifically, through its investigation over a period of two years, plaintiff has found "design and construct" violations in 61 of defendants' properties. Moreover, because, as plaintiff alleges, the tested properties share various combinations of common design elements with the untested properties, plaintiff may permissibly and reasonably allege on "information and belief" the existence of violations at each of the properties named in the complaint. Plainly, plaintiffs allege facts that demonstrate that the defendants' actions "have caused the organization to divert resources to identify and counteract the defendants' unlawful practices," and thereby impede and frustrate its core mission, which is, through "education, counseling, advocacy, enforcement, and referral services to aid protected individuals."

Defendants' assertion that plaintiff has suffered no injury because it is merely a "regional" organization with a mission that is "too generalized" is unavailing. Manifestly, ERC is an organization with a mission that is national in scope and breadth. This is true

notwithstanding the fact that plaintiff is the successor organization of several District of Columbia-area fair housing and fair employment organizations. Indeed, defendants' argument that plaintiff is merely a "regional" entity is quaintly nostalgic in this "Age of the Internet;" defendants seem not to appreciate the irony inherent in their citation to plaintiff's *website* in arguing that it is an organization with only parochial, "inside-the-beltway" interests. To the contrary, the national policies in favor of equal housing opportunity which animate plaintiff's mission as it works to eradicate housing discrimination (and/or inaccessibility) against persons with disabilities evidence its core mission: to ensure "equal opportunity" through "education, counseling, advocacy, enforcement, and referral services to aid protected individuals."

Moreover, the very fact that plaintiff undertook a nationwide investigation of defendants' violations is proof positive of plaintiff's concrete injury; the resources devoted to the two-year investigation were clearly "diverted." Nothing more is required. *See Havens*; *Williams v. Poretsky Management Inc.*, 955 F. Supp. 490 (D. Md. 1996); *National Fair Housing Alliance, Inc. v. Prudential Insurance Co. of America*, 208 F. Supp. 2d 46 (D.D.C. 2002). Here, plaintiff has alleged both diversion of considerable resources in identifying, investigating and testing the defendants' properties, and frustration of its mission of ensuring compliance with the ADA and FHA. Therefore, ERC enjoys organizational standing under the FHA to bring this action.[7]

---

[7]The parties dispute whether, in contrast to the principles of standing jurisprudence (continued...)

IV.

Defendants also challenge plaintiff's choice of venue. To survive a motion to dismiss based on improper venue, a plaintiff need only establish a *prima facie* showing that venue is proper. *Mitrano v. Hawes*, 377 F. 3d 402, 405 (4th Cir. 2004) (citing *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988)). Under Fed.R.Civ.P. 12(b)(3), all inferences are to be drawn in plaintiff's favor. *Three M Enters., Inc. v. Tex. D.A.R. Enters., Inc.*, 368 F. Supp. 2d 450, 454 (D. Md. 2005).

Where, as here, federal jurisdiction is premised on a federal question, venue is proper, pursuant to 28 U.S.C. § 1391, in a district where any one of three conditions is met: (1) the judicial district is one where any defendant resides, if all defendants reside in the same State;

---

[7](...continued)
applicable to the FHA (long held applicable under Titles I and II of the ADA), Congress intended to abrogate prudential limitations on organizational standing in Title III of the ADA. *Compare McInnis-Misenor v. Maine Medical Center*, 319 F.3d 63, 68-69 (1st Cir. 2003) (applying prudential limitations to an individual plaintiff under Title III of the ADA); *Small v. General Nutrition Companies, Inc*., 388 F.Supp.2d 83, 90-95 (E.D.N.Y. 2005)(same, as to organizational plaintiff, based on textual difference among Titles I and II, on the one hand, and Title III, on the other hand, of the ADA, and discussing *Clark v. McDonald's Corp.,* 213 F.R.D. 198 (D.N.J.2003)(same)), *with Independent Living Resources v. Oregon Arena Corp*., 982 F.Supp. 698, 760-61 (D.Or. 1997)(applying *Havens* rule and not considering prudential limitations on organizational standing under Title III of the ADA); *Goldstein v. Costco Wholesale Corp*., 278 F.Supp.2d 766 (E.D.Va. 2003)(similar, and concluding that although organization failed to prove standing under *Havens*, it nevertheless enjoyed representational standing). I need not, at this time, determine whether plaintiff also enjoys representational standing (plaintiff has not identified any of its members), or whether plaintiff should be afforded standing under the ADA. Nevertheless, it would be an absurdity of extraordinary proportions if, in this nationwide pattern and practice lawsuit seeking to vindicate the equal access rights of persons with disabilities, ERC were permitted to seek injunctive and declaratory relief which, if it were successful, would make it possible for persons with disabilities to live in otherwise non-conforming apartment units, while at the same time, as a result of a lack of plaintiff's standing under the ADA, persons with disabilities obtained *no access* or *limited access* to parking lots or leasing offices (public accommodations) at those very multi-family buildings.

(2) the judicial district is one in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) the judicial district is one in which any defendant may be found, if there is no district in which the action may otherwise be brought. 28 U.S.C. § 1391(b). Section 1391(c) further clarifies that, for purposes of venue, a corporation shall be deemed to "reside in any judicial district in which it is subject to personal jurisdiction." 28 U.S.C. § 1391(c). That venue may properly be laid in multiple districts does not preclude it from being proper in any one of those districts.

In this case, venue is proper pursuant to Section 1391(b)(1) because, pursuant to Maryland's long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103(b), this court may exercise personal jurisdiction over a person who "[t]ransacts any business or performs any character of work or service in the State." Equity Residential is a corporation formed and existing under the laws of the State of Maryland; EPR Operating Limited Partnership indisputably conducts operations, i.e., transacts business, in Maryland. In other words, defendants having nowhere challenged personal jurisdiction in this forum, plaintiff has established proper venue pursuant to under § 1391(b)(1).[8]

V.

Finally, defendants sought to have the court effectively "slice and dice" ERC's two legal claims into 300 separate claims (i.e., one claim for each property), and, thereafter,

---

[8]Defendants' assertion that plaintiff failed to invoke § 1391(b)(1) in its complaint is of no moment.

transfer each such "claim" to the federal district in which that property is located. Plainly, do so is not only inappropriate, but would unnecessarily create the very "litigation nightmare" against which defendants themselves admonish.

Rule 21 of the Federal Rules of Civil Procedure states, in part, that "[a]ny claim against a party may be separated and proceeded with separately." Fed. R. Civ. P. 21. A district court has broad discretion in deciding whether to grant severance. *CVI/Beta Ventures v. Custom Optical Frames*, 896 F.Supp. 505, 506 (D. Md. 1995) (*citing United States v. O'Neill*, 709 F.2d 361, 369 (5th Cir. 1983)). Courts have recognized a presumption in favor of the nonmoving party that all claims in a case will be resolved in a single trial and not be severed, placing the burden on the party moving for severance to show that (1) it will be severely prejudiced without a separate trial; and (2) the issue to be severed is so "distinct and separable" from the others that a trial of that issue alone may proceed without injustice. *See Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 548-49 (S.D.N.Y. 2005); *Lusk v. Pennzoil United, Inc.*, 56 F.R.D. 645, 647 (N.D. Miss. 1972) (*citing Swofford v. B & W Incorporated*, 336 F.2d 406, 415 (5th Cir. 1964)).

In determining whether severance is proper, courts consider: (1) whether the issues sought to be tried separately are significantly different from one another; (2) whether the separable issues require different witnesses and different documentary proof; (3) whether the party opposing severance will be prejudiced if it is granted; and (4) whether the party requesting severance will be prejudiced if the claims are not severed. *German v. Fed. Home*

*Loan Mortgage Corp.*, 896 F. Supp. 1385, 1400 (S.D.N.Y. 1995) (*citing Hal Leonard Publ. Corp. v. Future Generations, Inc.*, 1994 U.S. Dist. LEXIS 5195 (S.D.N.Y. 1994)).

The circumstances here weigh heavily against severance and transfer. First, defendants' hypothesis that there exists in this case more than two claims is not well-taken. There is no support whatsoever for the view that under the FHA or the ADA, complaints related to each structure or property in a "design and construct" violation claim constitutes a separate and distinct claim as a matter of law, and, obviously, plaintiff has not plead its case in that manner. It is to be recalled that violations of federal civil rights remedial legislation constitutes a "pattern or practice" where, as alleged here, "a company repeatedly and regularly engaged in acts prohibited by the statute." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336 n.16 (1977)(quoting legislative history of Title VII of the Civil Rights Act of 1964). The mere fact that defendants might gain some tactical advantage if plaintiff were put to the burden of bringing individual lawsuits in each district where their properties are located is scant reason to indulge the fiction that plaintiff has brought 300 "claims" in one lawsuit. This counterfactual assertion is rejected.[9]

This case involves a single plaintiff suing a single developer and its wholly owned subsidiary for violating two federal statutes intended to protect the right of equal opportunity in housing and public accommodations guaranteed to persons with disabilities by prescribing

---

[9]Understandably, defendants seek to draw the court into a close examination of the merits of plaintiff's claims, but that invitation is declined, as it should and must be. There will be time enough as discovery goes forward and as summary judgment practice is engaged for the court to call upon plaintiff to support its well-pled allegations with admissible evidence.

design and construction standards applicable to a large number of defendants' complexes. Courts have not hesitated in analogous circumstances to permit a disability-based discrimination claim covering multiple property sites to proceed as a single action against corporate-owner defendants. *See, e.g.*, *Dorsey v. Am. Golf Corp.*, 98 F. Supp. 2d 812 (E.D. Mich. 2000)(ADA case alleging discrimination at 257 golf courses nationwide, managed by one corporation); *United States v. Cinemark USA, Inc.*, 348 F.3d 569 (6th Cir. 2003) (ADA action alleging design and construct violations that discriminated against wheelchair-using patrons in 71 stadium-style theaters nationwide, owned by a single defendant). Despite the magnitude of this case, the model here is exactly the same.

To be sure, a paramount consideration here is the avoidance of prejudice to defendants and the assurance to them of a fair adjudication. Here, the issues to be tried are not "significantly different" from one another because they involve a single corporate defendant's alleged liability for compliance with the same set of FHA and ADA requirements. The mere fact that different engineers, developers, and/or architects will be witnesses relevant to different properties does not militate against the adjudication in this district of this case as a pattern and practice action. Defendants' liability *vel non* is not affected by this fact.

The 300 "Subject Properties" share common elements of bathroom, kitchen, and/or floor plan design. Regardless of the individual engineer or architect involved in the design and/or construction of the property, Equity Residential, the sole owner of each of these

properties, remains potentially liable under federal law. *United States v. Quality Built Constr., Inc.*, 309 F. Supp. 2d 756, 761 (E.D.N.C. 2003) ("When a group of entities enters into the design and construction of a covered dwelling, all participants in the process as a whole are bound to follow the [FHA]") (*quoting Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.*, 3 F. Supp. 2d 661, 665 (D. Md. 1998)). In fact, separating ERC's claim into 300 separate "mini-trials" would markedly prejudice plaintiff by forcing it to litigate virtually identical federal claims against a single defendant in multiple courtrooms.[10]

In sum, neither severance of two claims into hundreds of separate "claims," nor transfer is warranted here. *Cf.* 28 U.S.C. § 1404(a); *Helsel v. Tishman Realty & Constr. Co.*, 198 F. Supp. 2d 710 (D. Md. 2002).

---

[10]Defendants rely heavily on *Henderson v. AT&T Corp.*, 918 F. Supp. 1059 (S.D. Tex. 1996), for their contention that the potentially "dizzying number of individualized factual inquiries" that might result from this litigation necessitates severing ERC's claims. There, five plaintiffs in different offices brought a total of 20 varied discrimination claims against a particular division of defendant AT&T. The *Henderson* plaintiffs asserted different combinations of race-, sex-, and/or national origin-based discrimination claims, most of which relied on "particularized questions about each Plaintiff's work history and job performance." *Id.* at 1063.

Defendants' reliance is misplaced. Discrete acts and conduct of race-, sex-, and/or national origin-based performed by different actors in different offices are palpably different from numerous tape measurements at properties owned by one defendant.

*Henderson* is distinguishable in other ways as well. There, the employees' claims were based on federal *and* state law; here, only two federal laws are at stake, the FHA and ADA. In *Henderson*, the court severed the three plaintiffs' cases because they involved particularized questions of individual work histories and job performances, but *refused* to sever those claims involving overlapping facts and likely similar witnesses. *Id.* at 1063-64. Finally, jury confusion resulting from testimony in a discrimination case is distinct from that based on tape measurements: specific measurements of doorway widths, floor square footage, or slope gradation of ramps are certainly important but, not so "highly individualized" as to require "separate trials." That a "dizzying number of individualized factual inquiries" might result because defendants' alleged violations traverse such a large number of properties is not a sound basis on which to refuse to adjudicate this case.

VI.

For the reasons set forth, defendants' motion to dismiss, or in the alternative, to sever and transfer, has been denied.

Defendants are directed to file their answers to the complaint on or before April 30, 2007.

Filed: April 13, 2007

/s/
Andre M. Davis
United States District Judge