**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| EQUAL RIGHTS CENTER | : | |
| | : | |
| v. | : | Civil Action No. CCB-06-1060 |
| | : | |
| EQUITY RESIDENTIAL, *et al.* | : | |
| | : | |

...o0o...

## MEMORANDUM

The Equal Rights Center (the ERC) is a non-profit organization based in Washington, D.C. dedicated to, among other things, ensuring equal opportunities in housing for persons with disabilities through education, research, training, counseling, enforcement and advocacy. The ERC has sued Equity Residential and ERP Operating L.P. (collectively, "Equity"), alleging that Equity has "repeatedly and continually" designed and constructed properties that violate the Fair Housing Act (FHA), 42 U.S.C. §§ 3601-3619, and Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 *et seq.* Those violations, the ERC alleges, render the properties inaccessible to persons with disabilities. Equity moved to dismiss, arguing that the ERC did not allege facts sufficient to establish standing under Article III of the Constitution. Judge Andre Davis, to whom the case was then assigned, denied the motion.[1] Equity then moved for partial summary judgment, also on standing grounds, but this time on the basis of facts established through discovery. For the reasons that follow, the motion will be granted in part and denied in part. The ERC has shown standing to pursue its claims under the FHA, but not under Title III of the ADA.

---

[1] Judge Davis has since been appointed to the Fourth Circuit.

# BACKGROUND

As the only issue before this court is the ERC's standing to sue, the court will only recite the facts relevant to standing. The ERC is a non-profit organization based in Washington, D.C., "dedicated to ensuring equal opportunities in housing, employment, disability rights, immigrant rights, public accommodations and government services." (Declaration of Rabbi Bruce Kahn ("Kahn Decl.") ¶5.) It was formed in 1999 from the merger of the Fair Housing Committee of Greater Washington and the Fair Employment Council of Greater Washington. (*Id.* ¶6; Deposition of Rabbi Bruce Kahn, Def.'s Ex. B ("Kahn Dep."), at 12.) In 2005 it merged with the Disability Rights Council, and on April 7, 2006, amended its articles of incorporation to become a membership organization. (Kahn Decl. ¶6.) Its original membership included persons with disabilities as well as relatives of persons with disabilities and other persons dedicated to promoting the rights of persons with disabilities. (*Id.* ¶8.) Ensuring that people with disabilities are provided equal housing opportunities is one of the "core missions" of the ERC. (*Id.* ¶7.) The ERC advances its mission in various ways, including through "education, research, training, counseling, enforcement and advocacy." (*Id.* ¶5.)

One "well established ERC practice" is to engage in civil rights testing, which the organization has long used "to determine whether illegal discrimination [is] present, the extent of the discrimination, and the identities of the people or companies responsible for the discrimination." (*Id.* ¶¶10, 11.) Where testing reveals that discrimination might be present, the ERC "often engage[s] in a more systemic and targeted investigation that might include additional research and testing." (*Id.* ¶11.) If the ERC finds evidence that a particular person or company is engaging in discrimination, it "adhere[s] to its vision and mission by taking appropriate action to redress that discrimination." (*Id.* ¶12.) Sometimes that means "education and outreach,

advocacy, training, [and/or] counseling." (*Id.*) For example, the ERC develops and publishes reports to educate victims of discrimination, persons or entities that have committed acts of discrimination, and the general public about the existence and extent of discriminatory practices. (*Id.* ¶13.) Other times the ERC decides to use "persuasion, negotiation, [and/or] bringing the issue to the attention of government enforcement agencies" to redress instances of discrimination. (*Id.* ¶9.) Still other times the ERC determines that it is appropriate to file a lawsuit against a person or company that is engaged in unlawful discrimination in order to "eliminate instances of discrimination and to promote compliance with the civil rights laws." (*Id*. ¶¶9, 18.) "The choice of which measures to employ depend[s] on the origin of the decision to test, the nature and extent of the discrimination found, whether the discriminatory actor [is] an industry leader, the resources available to the ERC at the time and the costs associated with the measures being considered." (*Id.* ¶12.)

The ERC began conducting studies of multifamily housing properties in the Washington, D.C. area in 1997 through grants from the U.S. Department of Housing and Urban Development (HUD). (*Id*. ¶20.) The ERC published the results of those studies in a report on disability discrimination in the Washington, D.C. area housing market. (*Id.*) The ERC began receiving complaints about the inaccessibility of multifamily housing for people with disabilities in or around 2000. (*Id.*) Based on those initial studies and complaints, the ERC identified the inaccessibility of such properties as a "serious problem." (*Id.*) In 2004 the ERC conducted another study, also funded by HUD, which involved "a variety of tests including more than two dozen accessible design and construction tests of multifamily housing projects in and around the greater Washington D.C. metropolitan area." (*Id.*) This study revealed "violations of the FHA and ADA at every one of the multifamily properties tested." (*Id.*)

Based on these studies and complaints, the ERC began investigating particular developers, including Equity. (*Id.* ¶21.) The ERC began its investigation of Equity on June 10, 2005, when Rebecca Crootof, an ERC staff member, began conducting research about Equity properties, developing a testing methodology, choosing properties to test, finding testers, creating "tester profiles," drafting memoranda and reports, and arranging travel plans. (Def.'s Supp. App'x Tab L.) After conducting this "pre-testing investigation," the ERC began sending testers to Equity properties to determine whether Equity was complying with the design and construction requirements of the FHA and ADA. (Kahn Decl. ¶21.) The tests of five of these properties were conducted in connection with a project funded by HUD, through which the ERC conducted "more than 80 accessible design and construction tests of multifamily housing projects in and around the greater Washington D.C. metropolitan area." (*Id.* ¶22.) The initial testers of Equity properties found violations at every property, including the five tested through the HUD grant, and so the ERC continued to send testers to other Equity properties. "These results provided further reason for the ERC to continue and intensify its investigation of Equity." (*Id.*) Ultimately the ERC sent testers to inspect Equity properties in Florida, New Jersey, Washington, California, and Texas as well as the metropolitan D.C. area. (Kahn Decl. ¶21.) In all, the ERC tested sixty-one Equity properties and found violations of the FHA and ADA at every property tested. (*Id.*)

The ERC also acquired floor plans of additional Equity properties to which the ERC had not sent testers. (Deposition of Rebecca Crootof, Def.'s Ex. Tab F ("Crootof Dep."), at 160.) ERC staff inspected the plans to determine whether those properties shared "design elements . . . that were similar to design elements in tested properties that did not meet the requirements of the FHA." (Kahn Decl. ¶21.) If testing had revealed a potential violation, and if "an untested

property had a similar or the same floor plan for, let's say, the bathroom," and the violation at the tested property "was of the type that was related to the layout of that bathroom," then the ERC concluded that "there was reason to assume that the same violation might also exist at the untested property." (Crootof Dep. at 168-69.) This "floor plan review . . . disclosed that violations were likely to exist at the remainder of Equity's multifamily portfolio." (Kahn Decl. ¶21.)

In August 2005 Rabbi Kahn convened a meeting of leaders from Washington-area disability rights organizations. (*Id.* ¶23.) During the meeting, Rabbi Kahn "asked them if there was one crisis above all others that afflicted people with disabilities." (*Id.*) Rabbi Kahn reports that "without hesitation the entire group of leaders told me that the number one crisis for people with disabilities was finding accessible housing." (*Id.*) This response contributed to his decision to continue the ERC's investigation of Equity and other multifamily developers and "eventually [to] take enforcement actions against" them. (*Id.* ¶24.)

As the executive director of the ERC at the relevant times, Rabbi Kahn was responsible for deciding to further investigate Equity in the summer of 2005 and eventually to file this lawsuit. (*Id.*) Although the ERC had not received complaints about accessibility or discrimination at Equity properties specifically, Rabbi Kahn's decision to investigate Equity "was based entirely on the history of individual complaints received by the ERC during the period prior to the summer of 2005, evidence of widespread violations of the FHA and the ADA discovered during testing prior to the summer of 2005, coupled with the broad-based belief held by the representatives of the community of people with disabilities that lack of accessible housing was the primary concern of this community." (*Id.*)

The ERC has submitted detailed evidence of how its discovery of FHA and ADA violations by Equity required the organization to devote resources, including staff time and expenses, to further investigate the company, resources that the ERC would otherwise have devoted to other programs and activities. The organization has also detailed when those expenses arose. Specifically, the ERC devoted $57,464.81 of staff time and $12,566.22 of expenses to its investigation of Equity, all prior to filing this lawsuit. (Declaration of Donald L. Kahl ("Kahl Decl.") ¶¶24-25.) It also devoted $15,063.75 of staff time for education and outreach on accessible design and construction, a portion of which was spent prior to filing this lawsuit. (*Id.*)[2]

By devoting resources to investigating Equity, the ERC was forced to divert resources away from other programs. For example, the investigation of Equity caused the ERC to

---

[2] Federal Rule 56 requires that an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Equity objects to the court's consideration of Mr. Kahl's declaration because (1) to the extent it concerns injury to the ERC prior to the filing of the Equity lawsuit, his statements are inadmissible because he did not join the ERC until almost two years after the lawsuit was filed and thus his statements are not based on personal knowledge, and (2) to the extent his statements are based on personal knowledge, they concern alleged harm to the organization that is irrelevant to whether the ERC had standing in April 2006, when the lawsuit was filed. To a large degree, the Kahl declaration is duplicative of the Kahn declaration; on the facts that also appear in the Kahn declaration, the court need not decide the admissibility of the Kahl declaration. The court does rule, however, that paragraphs 24 and 25 of Mr. Kahl's declaration are admissible. Those paragraphs enumerate the staff time and expenses dedicated to the Equity investigation and disaggregate the resources dedicated to investigation from those dedicated to litigation. That information is clearly relevant to whether the ERC has standing, as will become apparent below. The information is also "capable of being reduced to admissible evidence." *U.S. Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.*, 64 F.3d 920, 926 n.8 (4th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). At trial, Mr. Kahl presumably could lay a foundation for admitting the records showing the hours worked and expenses incurred during the Equity investigation. The ERC could then seek their admission as business records through Federal Rule of Evidence 803(6). The fact that Mr. Kahl did not personally observe the hours being worked or expenses being incurred would not defeat the admissibility of those records. Mr. Kahl has attested that he acquired the knowledge about the staff time and expenses dedicated to the Equity investigation by reviewing ERC files. (Kahl Decl. ¶2; Pl.'s Opp'n to Def.'s Mot. to Strike, at 16-17.) Accordingly, the court may consider the information in ruling on Equity's motion for summary judgment. *See Cost Control Mktg.*, 64 F.3d at 926 n.8 ("[T]he practical question presented by a motion for summary judgment is whether the case presents a genuine issue of fact for trial rather than whether the parties have put their evidence in final form.").

diminish, eliminate, or otherwise offer less than it would have absent the Equity investigation of the following services: victim intake and counseling, seminars on discrimination against people with HIV/AIDS, an advertising campaign for the D.C. Metro Area Transit System to increase awareness of civil rights, various "Know Your Rights" seminars scheduled to occur in 2005 through 2007, education and outreach activities, compliance testing for a contract scheduled to have begun in June 2005, developing training materials required under third-party contracts, revising a real estate company's fair housing policy manual that was also scheduled to begin in June 2005, and revising internship training materials. (Kahn Decl. ¶26.) The Equity investigation diverted the time of various ERC staff members, including executive director Rabbi Kahn. The time Rabbi Kahn devoted to the Equity investigation was diverted from management and development activities, organization and implementation of a civil rights alliance, advancing an education and outreach campaign to religious institutions, expanding the ERC's programs on fair employment and public accommodations, organizing a nationwide collaboration to strengthen compliance with laws prohibiting housing choice voucher discrimination, conducting an advocacy and information campaign to promote housing choice voucher protection in the state of Maryland, and collaborating with other immigrant rights groups. (*Id.* ¶27.) By causing the ERC to divert resources from other activities, Equity's alleged discriminatory practices frustrated the ERC's mission of ensuring equal housing opportunities for people with disabilities. (*Id.* ¶29.)

The ERC incurred these costs, or at least a substantial portion of them, prior to filing its lawsuit against Equity. Once it filed the lawsuit, its costs continued to mount, both from litigation expenses and diversion of resources from other activities it would have conducted but for the Equity lawsuit. (*Id.* ¶28.) For example, the ERC was unable to produce five issues of its

quarterly newsletter, at least in part because of the resources it was devoting to the Equity lawsuit. (*Id.*) By interfering with the ERC's ability to publish the newsletter, the Equity lawsuit interfered with its ability to educate its membership on civil rights issues. (*Id.*)

The ERC has also expended resources as part of its efforts to counteract Equity's alleged discriminatory practices, efforts that are separate from this litigation. The ERC developed materials to "educate the [real estate development] industry, including Equity[,] about how and why they needed to comply with the provisions of the Fair Housing Act dealing with the design and construction of multifamily housing." (*Id.* ¶30.) The ERC also worked to increase awareness among persons with disabilities of their rights concerning accessible housing. (*Id.*) The ERC undertook various of these efforts prior to filing the Equity lawsuit: developing a presentation about accessible design and construction; training representatives of disability advocacy and membership organizations on rights to accessible housing; beginning to redesign the ERC website to include information on accessible design and construction; giving magazine and radio interviews on accessible design and construction issues; educating its members about accessible design and construction issues through its newsletter; meeting with "scores" of civil rights organizations to begin efforts to create a DC-Area Civil Rights Alliance in part to address inaccessible housing; and working with local governments, including a meeting with officials of Montgomery County, Maryland, to "enlist their aid in promoting and requiring FHA and ADA compliance." (*Id.*) Other efforts continued after the ERC filed the Equity lawsuit. For example, in the fall of 2007 Rabbi Kahn attended a board meeting of the National Association of Home Builders, where representatives of Equity were present, where he "explained what [he and others at ERC] were doing and why and pleaded with the developers to work with us to end the crisis of

inaccessible housing without further litigation." (*Id.*) Rabbi Kahn had other meetings with industry leaders throughout late 2007 and early 2008. (*Id.*)

In short, in response to the ERC's discovery that Equity was allegedly violating the FHA and the ADA, the ERC conducted activities that were "a major shift in the activities of the ERC." (*Id.* ¶31.) The ERC "would not have undertaken them but for the ERC's discovery of the widespread failure of Equity and other national developers to design and construct new multifamily housing to be accessible to people with disabilities as required by the FHA and ADA." (*Id.*)

The ERC sued Equity for violations of the FHA and Title III of the ADA on April 27, 2006. Equity moved to dismiss on June 26, 2006, arguing that the ERC did not allege facts sufficient to establish its standing to pursue the action, and that venue was improper. Equity also moved to sever the ERC's two claims into separate claims for each of the 300 properties that the ERC alleged violate the FHA and ADA. Judge Davis denied Equity's motions. *See Equal Rights Ctr. v. Equity Residential*, 483 F. Supp. 2d 482 (D. Md. 2007) ("*Equity I*"). The parties began discovery and entered into a stipulated protective order. The parties each filed motions for partial summary judgment, on November 10 and November 13, 2009, respectively. Equity's motion requested summary judgment as to twelve properties, the construction of four of which allegedly pre-dated the effective dates of the FHA and ADA, and eight of which were not owned by Equity when constructed. The ERC's motion requested summary judgment as to nine other properties. On July 15, 2010, the court granted a joint motion to stay discovery and remaining briefing on the parties' motions for partial summary judgment except on the question of the

ERC's standing to bring this action.  On August 6, 2010, the ERC responded to the portion of Equity's motion concerning standing, and Equity replied on October 27, 2010.[3]

During the course of briefing on the motion for partial summary judgment, the parties also filed several other motions.  Equity filed an interim motion to seal portions of the appendix to its memorandum in support of its motion, a motion to strike portions of the declarations and exhibits to ERC's memorandum in opposition, and an interim motion to seal portions of the appendix to its reply brief.  The ERC moved to file an earlier memorandum in opposition under seal.  Supplemental authority on the standing issue was filed in March 2011.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  Whether a fact is material depends upon the substantive law.  *Id.* at 248.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club,*

---

[3] Although Equity's cross-motion for partial summary judgment on the issue of standing purports to be limited to "Plaintiff's Nine Designated Properties," it is apparent from the substance of Equity's motion and the parties' joint motion to stay that the defendant's motion is not limited to the ERC's standing with respect to only those nine properties.  Rather, the parties agree that the question before this court is whether the ERC has standing to sue with respect to any of the approximately 300 properties listed in the complaint.

*Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court must "view the facts and draw reasonable inferences 'in the light most favorable to the

party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)

(alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the

court also must abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774,

778-79 (4th Cir. 1993) (internal quotation marks omitted).

## ANALYSIS

### I.        Standing on the Fair Housing Act claim

The Fair Housing Act authorizes any "aggrieved person," defined as "any person who . . .

claims to have been injured by a discriminatory housing practice" or "believes that such person

will be injured by a discriminatory housing practice that is about to occur," to "commence a civil

action in an appropriate United States district court or State court . . . to obtain appropriate relief"

for violations of the Act.  42 U.S.C. §§ 3602(i); 3613(a)(1)(A).  The term "person" includes

"associations," *id.* § 3602(d), and a "discriminatory housing practice" is defined as "an act that is

unlawful under section 3604, 3605, 3606, or 3617 of this title."  *Id.* § 3602(f).  This remedial

provision extends standing under the Act to the full extent permitted by Article III of the

Constitution.  *See Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972);

*Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 103 n.9 (1979).[4]  Although in some circumstances

---

[4] Although *Trafficante* and *Gladstone* considered an earlier version of the FHA that has since been amended, *see* Fair Housing Amendments Act of 1988, Pub. L. 100–430 § 813 (1988), their holding that Congress extended standing to the full extent of Article III continues to control, because *Trafficante* considered almost identical language in the context of the same statute.  *Compare* 42 U.S.C. § 3610(a) (1970) (granting a private right of action to "[a]ny person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice about to occur (hereafter 'person aggrieved')") *with* 42 U.S.C. § 3613(a)(1)(A), § 3602(i)(1) (2006) (granting a private right of action to "any person who—(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a

the federal courts are free to impose additional, prudential standing requirements above and beyond those imposed by the Constitution, *Allen v. Wright*, 468 U.S. 737, 751 (1984), the courts may not impose prudential standing requirements when Congress instructs that federal jurisdiction extend to the full extent permitted by Article III, such as through broad statutory language or otherwise "expressly negat[ing]" the presumption that the prudential standing doctrine applies. *Bennett v. Spear*, 520 U.S. 154, 163-64 (1997). For example, "Congress may, by statute, empower one party to bring suit because of harm *it* suffers due to unlawful discrimination against another party." *A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 363 (4th Cir. 2008) (emphasis in original). Because Congress has precluded courts from imposing additional standing barriers to claims arising under the FHA, a plaintiff has standing under the FHA so long it as can establish constitutional standing.

Article III of the Constitution restricts federal courts to the adjudication of cases and controversies. One aspect of the case-or-controversy requirement is Article III standing, which requires that any plaintiff, including an organizational plaintiff, allege and prove that it has "such a personal stake in the outcome of the controversy as to warrant" the exercise of federal jurisdiction. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To establish constitutional standing, a plaintiff must establish that

---

discriminatory housing practice that is about to occur"). Moreover, although the Supreme Court recently held that the term "person aggrieved" in Title VII of the Civil Rights Act of 1964 does not necessarily evince a congressional intent to permit standing to the full extent permitted by Article III, *see Thompson v. North Am. Stainless, L.P.*, __ U.S. __, 131 S. Ct. 863, 869-70 (2011) (holding that the term "aggrieved" in Title VII incorporates the prudential "zone of interests" test, notwithstanding "dictum" in *Trafficante* that Title VII conferred a right to sue on any plaintiff who satisfied Article III standing), it did not overrule *Trafficante*'s holding that standing under the FHA extends to the full limits of Article III. *Id.* at 869 ("Later opinions, we must acknowledge, reiterate that the term 'aggrieved' in Title VIII reaches as far as Article III permits. . . . In any event, it is Title VII [of the Civil Rights Act of 1964] rather than Title VIII [of the Civil Rights Act of 1968] that is before us here, and as to that we are surely not bound by the *Trafficante* dictum."). Therefore, to establish standing to bring a claim under the FHA, a plaintiff is only required to satisfy Article III.

> (1) [it] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180-81 (2000)

(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).  One way that a plaintiff

may establish an "injury in fact" is to show the invasion of a statutory right.  *Lujan*, 504 U.S. at

578 (quoting *Warth*, 422 U.S. at 500) ("The . . . injury required by Art. III may exist solely by

virtue of 'statutes creating legal rights, the invasion of which creates standing.'")

Standing is determined as of the date a plaintiff files suit, *Lujan*, 504 U.S. at 570 n.5

(plurality opinion), and each element of standing "must be supported in the same way as any

other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of

evidence required at the successive stages of the litigation."  *Lujan*, 504 U.S. at 561.  "At the

pleading stage, general factual allegations of injury resulting from the defendant's conduct may

suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those

specific facts that are necessary to support the claim.'"  *Id.*  At the summary judgment stage,

however, the nonmovant (here, the ERC) can no longer rest on mere allegations, but rather must

cite to "particular parts of materials in the record" that, taken as true, show that "a fact [relevant

to standing] cannot be or is genuinely disputed."  Fed. R. Civ. P. 56(c)(1).  If the movant, on the

other hand, "shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law," the court "shall grant summary judgment" to the movant

(here, Equity).  Fed. R. Civ. P. 56(a).

An organization may establish standing either by suing "on its own behalf when it seeks

redress for an injury suffered by the organization itself" or by suing "on behalf of its members

when: (1) its members would otherwise have standing to sue as individuals; (2) the interests at

stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005) (citation omitted). The former is generally known as organizational standing, the latter as associational standing. The ERC asserts standing based solely on organizational standing. It asserts that Equity's alleged discriminatory practices injured the organization itself because they "required the ERC to divert a substantial amount of resources away from other organizational activities," which in turn frustrated its mission "of ensuring equal housing opportunities [for] and eliminating discrimination [against] people with disabilities." (Pl.'s Mem. at 8, 21.)

The Supreme Court addressed the standing of organizations bringing FHA claims in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). There, an organization, Housing Opportunities Made Equal (HOME), sued the owner of an apartment complex and one of its employees for alleged "racial steering," which involved "steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups." *Id.* at 366 n.1. HOME alleged that the defendants' alleged racial steering practices had caused it to "devote significant resources to identify and counteract" those practices and thereby "frustrated . . . its efforts to assist equal access to housing through counseling and other referral services." *Id.* at 379. The Court held that these allegations were sufficient to satisfy Article III standing at the motion-to-dismiss stage because, if HOME could prove that the defendants' actions "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there [could] be no question that the organization ha[d] suffered injury in fact." *Id.* "Such concrete and demonstrable injury to the organization's activities—with the

consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.* Moreover, an organization may have standing under *Havens* even if "the alleged injury results from the organization's noneconomic interest in encouraging open housing." *Id.* at 379 n.20 (citing *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 263 (1977)).[5]

Thus, an organization suffers an injury-in-fact sufficient to satisfy the first prong of the Article III standing analysis where the organization incurs expenditures in identifying and counteracting a company's violations of the FHA and those expenditures perceptibly impair the organization's ability to advance its mission.[6] If the organization shows that its injury is traceable to the defendant's alleged violations of the FHA, and that a favorable decision would likely redress its injury, the organization has established that it has standing under Article III.

## A. Injury in fact

As an initial matter, the ERC argues that the existence of an injury in fact has already been conclusively determined and is the law of the case. When Judge Davis denied Equity's motion to dismiss, he set forth the legal standard provided by *Havens*, and held that the ERC's

---

[5] Although the Fourth Circuit has cited *Havens*, it largely has done so in contexts inapposite to the questions presented here. While the court cited *Havens* in finding organizational standing in *White Tail Park, Inc.*, 413 F.3d at 451, the organization there suffered from decreased membership in its summer camp as a result of a Virginia statute, an injury arguably more direct and concrete than the injury the ERC has alleged and shown here. Thus the opinion does not squarely address the type of injury at issue in this case.

[6] Some courts have treated "diversion of resources" and "frustration of mission" as independent, alternative ways an organization can show the type of injury considered in *Havens*. *See, e.g.*, *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (affirming separate awards of $14,217 for diversion of resources "to investigating and other efforts to counteract [the defendant's] discrimination above and beyond litigation," and $10,160 in frustration of mission damages, for "design, printing, and dissemination of literature aimed at redressing the impact" of the discrimination). In *Havens*, however, the Supreme Court described "diversion of resources" and "frustration of mission" as two aspects of the same damages: an organization has standing where the defendant's practices require the organization to divert resources to investigating and counteracting those practices, which in turn frustrates the organization's ability to advance its mission. *See Havens*, 455 U.S. at 379. Although it is conceivable that a distinction between "diversion of resources" and "frustration of mission" could become relevant at the damages stage, the court will treat them as one and the same for standing purposes.

complaint alleged facts sufficient to satisfy *Havens* for purposes of the ERC's FHA claim. 483 F. Supp. 2d at 486-87. The ERC argues that certain aspects of Judge Davis's reasoning require, as a matter of law of the case, that Equity's motion for summary judgment on the FHA claim be denied. Specifically, the ERC points to Judge Davis's holding that "the very fact that plaintiff [allegedly] undertook a nationwide investigation of defendants' violations is proof positive of plaintiff's concrete injury." *Id.* at 486. The ERC argues that because Judge Davis held that the allegation that the ERC "undertook a nationwide investigation" was sufficient to allege injury in fact, and because the ERC has now presented evidence that it undertook a nationwide investigation of Equity's properties, Equity's motion for summary judgment must be denied solely on law-of-the-case grounds.

It is true that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case," *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988), and, accordingly, a court's holding on a motion to dismiss may affect the disposition of a later motion for summary judgment. *PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 6 (D.D.C. 2004). A denial of a motion to dismiss would only be dispositive of a later summary judgment motion, however, if the factual showing were essentially congruent with the factual allegations made in the complaint. *See id.* at 7 ("[A] summary judgment motion 'may not be made on the same grounds and with the same showing that led to the denial of a previous motion to dismiss.'") (citing 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure: Civil 3D* § 2713 at 233 (2d. ed. 1998)). Here, in contrast, the evidence presents facts that are far more complete and detailed than were the allegations Judge Davis considered in ruling on Equity's motion to dismiss. For example, the evidence disaggregates the expenses the ERC incurred before filing this lawsuit

from those incurred after; it details the efforts the ERC dedicated to investigating and counteracting the defendant's alleged discriminatory practices; and it explains how the ERC came to begin investigating Equity in the first place. Because each of these nuances, among others, affects the analysis of the ERC's standing, but were not issues raised by the allegations presented in the ERC's complaint, Judge Davis's reasoning is not dispositive of Equity's motion for summary judgment. Although this court has concluded that there is at least a genuine issue of material fact as to the ERC's standing, the court reaches that conclusion based on the evidence presented, not as a matter of law of the case.

The evidence shows that the ERC suffered an injury when, pursuant to its mission to promote fair housing for persons with disabilities, it expended resources to investigate and counteract Equity's alleged discriminatory practices.[7] The organization expended resources on investigation in three ways: pre-testing investigation, testing, and a post-testing floor-plan review. Its pre-testing investigation consisted of researching Equity properties, developing a testing methodology, recruiting testers, and arranging travel plans for testers. The ERC then expended significant resources to test Equity properties, sending testers to sixty-one Equity properties in Florida, New Jersey, Washington, California, and Texas as well as the metropolitan D.C. area. It then conducted a "floor plan review" of other Equity properties to determine whether Equity may have also violated the FHA at those properties based on whether those properties shared design elements with the properties the ERC had confirmed were in violation of the FHA.

The ERC also expended resources counteracting Equity's alleged FHA violations. The organization worked to increase awareness among persons with disabilities of their rights under the FHA. It developed materials to educate real estate developers about how to comply with the

---

[7] Whether and how those injuries are traceable to those practices will be discussed below.

Act.  It trained representatives of disability advocacy and membership organizations on rights to

accessible housing, redesigned the ERC website to include information on accessible design and

construction, and worked with local governments to "enlist their aid" in promoting FHA and

ADA compliance.  (Kahn Decl. ¶30.)  Although some of those efforts began before the ERC's

investigation of Equity and some post-dated the filing of this lawsuit, at least some were

conducted during the period in which the ERC was investigating Equity's violations of the

FHA.[8]

By expending those resources to identify and counteract Equity's alleged violations of the

FHA, the ERC's ability to advance its mission of promoting accessible housing for persons with

disabilities was perceptibly impaired.  As Rabbi Kahn, the executive director of the ERC from

2004 to 2008, averred, "[t]he time the ERC spent on the Equity investigation in 2005 and the

first quarter of 2006, interfered with its existing programs, including" work on victim intake and

---

[8] Because the ERC expended resources investigating Equity and counteracting its alleged discrimination, including by sending testers to sixty-one Equity properties, the court need not decide whether "litigation costs" alone would have been sufficient to establish standing.  *Compare Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) ("[T]he only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination.  These are opportunity costs of discrimination, since although the counseling is not impaired directly there would be more of it were it not for the defendant's discrimination.") (emphasis added), *and Ragin v. Harry Macklowe Real Estate Co*., 6 F.3d 898, 905 (2d Cir. 1993) (holding that the plaintiff organization's devotion of "substantial blocks of time" to filing an administrative complaint, identifying the developers and marketers of buildings with alleged violations, and attending a conciliation conference were sufficient because they "prevented [the organization's staff] from devoting their time and energies to other . . . matters"), *with Equal Rights Ctr. v. Post Props, Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011 ("[T]he diversion of resources to litigation or investigation in anticipation of litigation does not constitute an injury in fact sufficient to support standing."), *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation."), *and Walker v. City of Lakewood*, 272 F.3d 1114, 1124 n. 3 (9th Cir. 2001) (declining to consider "the time and money the [housing organization] has expended in prosecuting this suit" in deciding if the organization had standing), *and Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 79 (3d Cir. 1998) ("We align ourselves with those courts holding that litigation expenses alone do not constitute damage sufficient to support standing."), *and Assoc. for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").

counseling, seminars, public service advertising campaigns, compliance testing, and training materials (Kahl Decl. ¶26), along with time Rabbi Kahn himself would have otherwise spent on management and development activities, the organization of a nascent Washington, D.C.-area civil rights alliance, and expanding the ERC's programs on fair employment and public accommodations, among other activities. (*Id.* ¶27.)

Despite the evidence that the ERC expended resources to investigate and counteract Equity's alleged discriminatory practices, which diverted resources from other activities and frustrated its mission, Equity argues that, as a matter of law, the ERC did not suffer an injury for three reasons. First, Equity argues that because the ERC has not pointed to "an actual disabled person with real intentions to rent or purchase" a home from Equity, it cannot show that it suffered an injury. Under the FHA, it is unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap," 42 U.S.C. § 3604(f)(1), or to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." *Id.* § 3604(f)(2). The "handicap" in (f)(1) or (f)(2) must be "of (A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling after it is so sold, rented or made available; or (C) any person associated with that buyer or renter." *Id.* §§ 3604(f)(1), (f)(2). Equity argues that because these sections of the FHA only prohibit discrimination "in the sale or rental" of a dwelling, *id.* § 3604(f)(1), or "in the terms, conditions, or privileges of sale or rental" of a dwelling, *id.* § 3604(f)(2), and because neither the ERC's testers nor the ERC itself ever had a "real intention[]" of buying or renting an Equity dwelling, the ERC does not assert a violation of a right protected by the FHA.

The Supreme Court's recognition of organizational standing in *Havens*, however, precludes this argument. In *Havens*, the organizational plaintiff was injured because the defendants' alleged racial steering perceptibly impaired the organization's ability to assist low- and moderate-income homeseekers. 455 U.S. at 379. Similarly, here the ERC has proffered evidence that its ability to ensure fair housing for persons with disabilities has been perceptibly impaired by Equity's alleged discriminatory practices. The nature of the underlying violations of the FHA does not defeat the ERC's standing to bring this action. Although the *Havens* Court discussed the nature of the underlying alleged violations, that discussion was relevant to the standing of the testers hired by HOME, not the standing of HOME itself, and thus is inapposite to whether the ERC has standing here. *See Havens*, 455 U.S. at 373-75. The FHA provision allegedly violated in *Havens* prohibits "represent[ing] to any person because of race . . . that any dwelling is not available for inspection, sale or rental when such dwelling is in fact so available." 42 U.S.C. § 3604(d). That provision "conferred on all 'persons' a legal right to truthful information about available housing." 455 U.S. at 373. Because the black testers hired by HOME were falsely told that apartments were unavailable, the testers had alleged an injury of their rights under the FHA, and thus had standing, even though they did not have an "intent to rent or purchase a home or apartment." *Id.* The Court did not, however, consider this issue relevant to whether HOME had standing. Rather, HOME's standing arose solely based on its diversion of resources to investigate the allegations of racial steering. Thus, the differences between the rights secured by 42 U.S.C. § 3604(d), which was at issue in *Havens*, and those secured by § 3604(f), which is at issue here, may arguably have been relevant if the testers who inspected Equity properties had joined this action as plaintiffs. Those differences, however, are

irrelevant to whether the ERC's ability to further its mission was perceptibly impaired by Equity's alleged discriminatory practices.[9]

Second, Equity argues that for the ERC to show that it diverted resources, it must show that it was forced to *decrease* the level of funding of other ERC programs as a result of Equity's alleged discriminatory practices. The ERC cannot make this showing, Equity argues, because the "ERC has *increased* funding of outreach community programs." (Def.'s Mem. at 16 (emphasis in original).) The evidence shows, however, that the ERC was forced to decrease the resources devoted to certain programs. (*See, e.g.*, Kahn Dep. ¶¶26-27 (detailing various activities that the ERC was forced to curtail because it was devoting resources to the Equity investigation).) Thus, the ERC's efforts to investigate Equity differ from those ruled insufficient in *NAACP v. City of Kyle, Texas*, 626 F.3d 233 (5th Cir. 2010). There, the Fifth Circuit held that an association of builders lacked standing to challenge zoning ordinances because, although it expended $15,000 on a "study on the impact of the revised ordinances" and engaged in various lobbying efforts to urge the city to amend its ordinances, the organization had not "identified any specific projects that [it] had to put on hold or otherwise curtail in order to respond to the revised ordinances." *Id*. at 238-39. Here, the ERC has identified specific projects that it had to curtail in order to investigate and counteract Equity's alleged discriminatory practices, and identified activities that it could and would have pursued if it had not dedicated resources to its investigation of Equity.

---

[9] Moreover, although Equity cites two unpublished decisions within the Ninth Circuit for the proposition that a claim under (f)(1) or (f)(2) must involve an actual disabled person with real intentions to rent or purchase, *see Ricks v. Beta Dev. Co*., No. 95-15334, 1996 WL 436548, *2 (9th Cir. Aug. 1, 1996); *United States v. Rock Springs Vista Dev. Corp*., No. CV-S-97-1825JBR(RLH), 1999 WL 1491621, *3 (D. Nev. July 2, 1999), *aff'd* 8 F. App'x 837 (9th Cir. May 8, 2001), the Ninth Circuit has since held in a published opinion that a person who observes an inaccessible property does not need to "have an interest in actually purchasing or renting a particular property or dwelling in order to allege a discriminatory violation" of § 3604(f)(2). *Smith v. Pacific Properties*, 358 F.3d 1097, 1099 (9th Cir. 2004).

Moreover, even if the ERC had not detailed the activities that received less funding because of the resources diverted to the Equity investigation, Equity's argument misses the point. *Havens* does not require that a defendant's actions force an organization to decrease the levels at which it funds other programs. All *Havens* requires is that other programs be "perceptibly impaired." 455 U.S. at 379. Although a decrease in funding could be sufficient to meet this standard, it is not necessary. An organizational plaintiff could alternatively show, as the ERC has done here, that a defendant's actions caused the organization to fund other programs at levels lower than it would have but for the drain on an organization's resources resulting from a defendant's alleged discriminatory practices. The baseline to establish standing because of diversion of resources is the level of funding other programs would have received absent an investigation of a defendant's actions, not the level of funding for other programs before an organization began its investigation.[10]

---

[10] Although language in *Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc.*, 498 F. Supp. 2d 187 (D.D.C. 2007), seems to indicate that a decrease in funding for other programs might be necessary, the court's approach has since been rejected by the D.C. Circuit. In *Long Term Care*, the court reasoned that because "not every diversion of resources away from an organizational goal will confer standing," "a diversion of resources only becomes relevant where a defendant's conduct *impedes* the plaintiff organization's activities." *Id.* at 191-92 (emphasis added); *see also id.* ("The court has distinguished between organizations that allege that their *activities have been impeded* from those that merely allege that their *mission has been compromised*.") (quoting *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129 (D.C. Cir. 2006)) (emphasis added). The court concluded that the organization had not alleged that their activities had been "impeded" because the organization was "merely . . . choosing to fight a policy that is contrary to its mission." *Id.* at 192. In other words, the court was inquiring into whether the organization voluntarily diverted its resources, or rather was somehow involuntarily forced to divert resources. The D.C. Circuit has since rejected that reasoning. In *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136 (D.C. Cir. 2011), the court explained, "Instead of focusing entirely on the voluntariness of the ERC's diversion of resources . . . the district court should have asked, first, whether Post's alleged discriminatory conduct injured the ERC's interest in promoting fair housing and, second, whether the ERC used its resources to counteract that harm." *Id.* at 1140. Moreover, even if the *Long Term Care* court's approach were to apply, the reasoning does not necessarily require evidence of a decrease in funding of other programs. An organization's activities can be "impeded" from growing as quickly as they would have absent a diversion of resources to investigate a defendant's violations of the FHA. Thus, even if there were no evidence in the record of a decrease in the funding of other activities (though here there is), the ERC could show that its activities were "impeded."

Third, Equity argues that the ERC did not suffer an injury because the organization does not point to "contemporaneous ERC allocations or budgets" that enumerate specific activities that were "planned" or "slated to be funded" but were cancelled because of the need to expend resources to investigate and counteract Equity's practices. (Def.'s Mem. at 16; Def.'s Reply at 11.) There is no requirement in *Havens*, however, that an organization rely on any particular type of evidence to show that its ability to further its mission was perceptibly impaired. Here, as Rabbi Kahn described in detail in his declaration, the ERC devoted resources to investigating and counteracting Equity's practices, which left it with fewer resources for other programs. This evidence is sufficient to, at minimum, create a genuine issue of material fact as to the diversion of resources. *See Saunders v. General Servs. Corp.*, 659 F. Supp. 1042, 1052 (E.D. Va. 1987) (holding that testimony and log entries that staff "was forced to spend significant time investigating [the defendant's] advertising practices and attempting to counteract the alleged discriminatory advertising they found" was sufficient to survive summary judgment; because the organization did not have to "point to specific financial expenditures or employment of individuals caused by [a defendant's] alleged violations in order to establish standing").

For these reasons, the ERC suffered an injury in fact sufficient to satisfy the first prong of the Article III standing analysis. The next question is whether that injury is traceable to Equity's alleged violations of the FHA.

### B. Traceability

When the ERC began investigating in the summer of 2005 whether Equity was complying with the FHA, it knew that various other multifamily housing developers, including every developer with properties tested in Washington, D.C., were in violation of the Act. (Kahn Decl. ¶¶20-22.) There is no evidence in the record that the ERC knew prior to summer 2005 that

Equity was in violation of the Act, either from its investigations through HUD grants or individual complaints. Nonetheless, based on the substantial evidence of widespread violations by other developers, the ERC decided that it was worth expending resources on an investigation of Equity. As soon as it began sending testers to inspect Equity properties, it found violations of the Act. Indeed, the ERC tested sixty-one Equity properties, and found violations of the FHA at every property tested.

Nonetheless, Equity argues that the ERC's diversion of resources is not traceable to Equity's alleged violations, for four principal reasons. First, Equity argues that the expenses the ERC incurred in conducting these tests—and the consequent diversion of resources and frustration of the ERC's mission—cannot be traced to Equity because the ERC did not have reason to believe *before* it began investigating Equity that Equity specifically, as opposed to any other developer, had violated the Act. *Havens* does not require, however, that an organization suffer an injury before it begins an investigation. In fact, in *Havens* the Supreme Court expressly held that an organization's diversion of resources to "identify and counteract" the defendant's discriminatory practices are sufficient to allege standing under the FHA, so long as the need to divert those resources frustrated its mission. 455 U.S. at 379. The Court did not require HOME to show that the resources it spent to "identify and counteract" the defendants' actions were expended before HOME began investigating those actions. Even assuming without deciding that the cost of sending testers to the very first Equity property tested was not traceable to a violation of the FHA by Equity, there can be no question that as soon as the ERC discovered that at least one Equity property was in violation of the Act, every subsequent expense associated with the ERC's investigation of Equity and counteraction of its alleged violations is traceable to those violations.

Second, Equity argues that the ERC's diversion of resources is not traceable to its alleged violations because the ERC never received a complaint that Equity was violating the FHA. *Havens*, however, does not require that an organization receive a complaint about a particular developer prior to beginning an investigation into whether the developer's properties violate the FHA. Although one of the plaintiffs in *Havens* appears to have been a victim of discrimination who was not a tester, the Court in *Havens* never discussed how the organization there learned of the alleged violations of the Act, whether through a complaint by that person or based on its own investigation. All that *Havens* requires is that the organization show it has diverted resources to investigate and counteract alleged violations of the FHA committed by Equity. As discussed above, the ERC has made that showing here.

Third, Equity argues that even if the ERC expended resources in response to Equity's actions prior to filing suit, it cannot show that resources were specifically expended to investigate Equity's properties because "ERC's investigation was simultaneously directed at 14 other companies" (Def.'s Mem. at 17). *See Arkansas ACORN Fair Housing, Inc. v. Greystone Dev., Ltd. Co.*, 160 F.3d 433, 434-35 (8th Cir. 1998) (holding that a fair housing organization did not have standing because, although an affidavit showed that the staff spent over 40 hours per month identifying violators of fair housing laws and working to counteract discriminatory advertising practices, including time spent monitoring the defendant's advertisements, the affidavit did not disaggregate how much of that staff time was spent specifically to monitor and counteract the defendant's advertisements). Here, the ERC has separately accounted for the time and expense devoted to investigating Equity, disaggregating the resources expended on those efforts from those expended on efforts to investigate and combat discrimination by other multifamily housing developers. (*See* Kahl Decl. ¶24.) Moreover, Equity does not dispute that

the ERC sent testers to Equity properties, including some of the nine properties that are the subject of Equity's cross-motion.  Therefore, the fact that the ERC was investigating other developers at the same time it was investigating Equity does not defeat the ERC's standing to sue Equity.

Fourth, Equity argues that because the ERC "affirmatively chose to budget resources to investigate and later sue Equity," the diversion of resources to that investigation, including those spent on testing, was "self-inflicted" and hence not traceable to Equity.  (Def.'s Mem. at 20.)  It is true that the district court in *Post Properties* held that if an organization "*chose* to redirect its resources to investigate [a developer's] allegedly discriminatory practices," the injury was "self-inflicted" and would not constitute an injury traceable to the developer.  *Equal Rights Ctr. v. Post Props., Inc.*, 657 F. Supp. 2d 197, 201 (D.D.C. 2009) (emphasis in original).  The D.C. Circuit, however, has since rejected that reasoning.  The fact that an organization "voluntarily . . . diverts its resources . . . does not automatically mean that it cannot suffer an injury sufficient to confer standing." *Post Props.*, 633 F.3d at 1140.  Rather, the proper inquiry there was, "first, whether Post's alleged discriminatory conduct injured the ERC's interest in promoting fair housing and, second, whether the ERC used its resources to counteract that harm." *Id*.  In *Post Properties*, the ERC did not meet that burden because, although the evidence showed that the ERC had incurred expenditures, the ERC did not "indicate when the ERC undertook the specified activities," and thus had not shown that the expenditures arose "in response to, and to counteract, the effects of the defendants' alleged discrimination rather than in anticipation of litigation." *Id.* at 1140-41.

Even assuming for the moment that the D.C. Circuit's standard were to control the ERC's claim against Equity, which this court does not decide, the ERC has met that burden.  Apparently

unlike in the *Post Properties* case, the ERC here has submitted detailed evidence of when its expenses arose, disaggregating those expenses that arose before and after the ERC filed its lawsuit against Equity.  (*See* Kahn Decl. ¶¶ 25-26; Kahl Decl. ¶¶24-25, 27-28; Supp. Kahl Decl. ¶¶ 20-23.)  In so doing, the ERC has shown that its discovery of FHA violations by Equity caused the ERC to devote resources, including staff time and expenses, to investigate the company's alleged discriminatory practices.  The resources it dedicated to investigate and counteract those practices are resources the ERC would otherwise have devoted to other programs and activities.  Thus, as the D.C. Circuit requires, the ERC has shown that Equity's "alleged discriminatory conduct injured the ERC's interest in promoting fair housing," and that the ERC "used its resources to counteract that harm."[11]

Equity's other arguments concerning traceability are easily rejected.  Equity argues that the ERC does not have standing because the ERC did not reach out to Equity before filing a lawsuit to seek a non-judicial resolution of the ERC's claims.  Article III does not require a plaintiff to negotiate with a potential defendant before filing suit.  Although such efforts may prevent the parties and the courts from incurring costs associated with litigation, the failure to resolve a dispute before resorting to litigation does not strip a plaintiff of standing to sue. Finally, Equity's argument that the "ERC has no office or business in California, Massachusetts or Maryland, where most of the Nine [properties] are located" (Def.'s Mem. at 21) is irrelevant to whether the ERC has standing under the FHA.

---

[11] Because the ERC's evidence separates expenditures related to pre-litigation investigation from those devoted to litigation, the one Fourth Circuit case to address the issue, which is unpublished, is distinguishable.  In *Maryland Minority Contractors Assoc. v. Lynch*, Nos. 98-2655, 99-1272, 2000 WL 135103 (4th Cir. Feb. 7, 2000) (unpublished, per curiam), the plaintiff organization failed to allege facts sufficient for standing, even though it alleged that the defendants' conduct "frustrat[ed] its corporate policies [and] practices" and caused it to "expend[] over $7,600.00 of its corporate funds to fight against Defendants' unlawful racially discriminatory contracting policies and practices," because the organization did not disaggregate which expenditures "consist of attorneys fees and litigation costs" and which "arise from activity not directly related to the lawsuit."  *Id.* at *5.  The ERC, in contrast, has disaggregated those expenditures.

For these reasons, the ERC has proffered sufficient evidence from which a reasonable jury could find that Equity's alleged discriminatory practices perceptibly impaired the ERC's ability to provide its existing services and thereby frustrated its mission of ensuring equal housing opportunities for people with disabilities. Because Equity does not dispute that a favorable decision would redress the injury, the ERC has standing to sue Equity based on Equity's alleged violations of the FHA.

## II.     Standing under ADA Title III

The ERC has also sued Equity under Title III of the ADA, seeking declaratory and injunctive relief.[12] Title III authorizes a person to seek injunctive relief if the person "is being subjected to discrimination on the basis of disability" or "has reasonable grounds for believing that such person is about to be subjected to discrimination." 42 U.S.C. § 12188(a)(1). Although the Fourth Circuit has held that the private right of action under Title II of the ADA is available to any person with Article III standing, *see Helping Hand*, 515 F.3d at 363, the language of Title III's remedial provision is narrower than the corresponding provisions in Titles I and II of the ADA. *Compare* 42 U.S.C. § 12117 (Title I) (providing a remedy to "any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment") *with* 42 U.S.C. § 12133 (Title II) (providing a remedy to "any person alleging discrimination on the basis of disability in violation of section 12132"). When a plaintiff claims a right to sue under a legislatively-created cause of action, courts must not only ask "whether *any* plaintiff has a cause of action under the statute," but also "whether *this* plaintiff has a cause of action under the

---

[12] Although the ERC's complaint does not expressly limit its request for damages to its FHA claim, damages are not available to private plaintiffs under Title III of the ADA. *See* 42 U.S.C. § 12188(a). Therefore, the court will construe the ERC's prayer for relief under the ADA as limited to a request for a declaratory judgment and injunctive relief.

statute," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 n.2 (1998) (emphases in original), a requirement often known as "statutory standing." *See Friends of the Earth, Inc. v. Laidlaw Env'tl Serv. (TOC), Inc.*, 528 U.S. 167, 175 (2000) ("[W]e have held that citizens lack statutory standing under § 505(a) [of the Clean Water Act] to sue for violations that have ceased by the time the complaint is filed.").[13] The ERC has pointed to no evidence that the organization itself "is being subjected to discrimination on the basis of disability" or "has reasonable grounds for believing that such person is about to be subjected to discrimination." Therefore, it does not have statutory standing under Title III of the ADA.

The ERC argues that even though it is not itself a victim of discrimination, that question is only relevant to whether the ERC's ADA claim is barred by the prudential "prohibition on a litigant raising another person's legal rights," *Allen*, 468 U.S. at 751, and prudential standing barriers do not apply to claims under ADA Title III. But whether prudential limitations apply under Title III, whether the ERC's ADA claims should be barred because the ERC is "raising another person's legal rights," and whether the ERC has shown that it has a constitutionally cognizable injury in fact, are not controlling in this context. The question is whether Title III has granted the ERC a cause of action based on the allegations the ERC presents here. Under the plain language of the statute, it has not.[14]

---

[13] *See also In re Mutual Funds Investment Litigation*, 529 F.3d 207, 216 (4th Cir. 2008) (finding that cashed-out former employees remain "participants" in defined contribution retirement plans for purposes of § 502(a)(2) of ERISA, and therefore have "statutory standing" to bring their claims); *Cetacean Community v. Bush*, 386 F.3d 1169, 1175 (9th Cir. 2004) ("If a plaintiff has suffered sufficient injury to satisfy the jurisdictional requirement of Article III but Congress has not granted statutory standing, that plaintiff cannot state a claim upon which relief can be granted.") (citing *Steel Co.*, 523 U.S. at 97); Radha Pathak, *Statutory Standing and the Tyranny of Labels*, 62 Okla. L. Rev. 89, 94 (2009) (describing the inquiry as "whether the plaintiff falls within the class of people to whom the legislature has granted a private right of action").

[14] It is true that in some cases, the statutory standing and zone-of-interests inquiries become intertwined. For example, the Supreme Court recently held that the term "aggrieved" in Title VII of the Civil Rights Act of 1964 "incorporates [the zone-of-interest test], enabling suit by any plaintiff with an interest 'arguably [sought] to be protected by the statutes.'" *Thompson*, __ U.S. __, 131 S. Ct. at 870 (first alteration added, second in original).

Some opinions have approached this question differently, analyzing under prudential frameworks, particularly the prohibition on raising the claims of third parties, whether an organization like the ERC can sue under Title III. *See, e.g.*, *Equal Rights Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 520-23 (D. Md. 2010); *Equal Rights Ctr. v. Hilton Hotels Corp.*, Civil No. 07-1528 (JR), 2009 WL 6067336, *4-*5 (D.D.C. Mar. 25, 2009); *Small v. General Nutrition Cos., Inc.*, 388 F. Supp. 2d 83, 92-94 (E.D.N.Y. 2005); *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 210-12 (D.N.J. 2003). Although I reach the same conclusion, I do so based on Congress's decision to limit the private right of action under Title III to persons "being subjected to discrimination" or those with "reasonable grounds for believing that such person is about to be subjected to discrimination," 42 U.S.C. § 12188(a)(1), not based on judicially-created prudential limitations. It is Congress, not the courts, that has barred organizations not themselves victims of discrimination from suing under Title III of the ADA.[15]

In concluding that the ERC cannot continue to press its ADA claim, the court is constrained by the plain language of Title III. As noted above, Title II of the ADA (and presumably Title I as well) confers a private right of action on anyone with a constitutionally cognizable injury. Although a House report states that, "[a]s with other titles of the [ADA], the [House Judiciary Committee] intends that persons with disabilities have remedies and procedures

---

Similarly, in *McInnis-Misenor v. Maine Medical Center*, 319 F.3d 63 (1st Cir. 2003), in deciding whether a disabled woman who was "attempting to have a second child, but [was] not yet pregnant" had standing under Title III of the ADA, the court reasoned, "The statutory language 'about to be subjected to discrimination' dovetails with the usual prudential analysis as to whether McInnis-Misenor's claims are too contingent and premature." *Id.* at 69-70. In the context of this case, however, such intertwining is unnecessary because the ERC's statutory standing is precluded by the plain language of Title III.

[15] Because the language of Title III excludes organizations that are not themselves victims of discrimination from the reach of Title III's private right of action, I must respectfully disagree with those opinions that have held that all an organization need show to sue under Title III is an injury sufficient to establish Article III standing. *See, e.g.*, *Equal Rights Ctr. v. AvalonBay Communities, Inc.*, Civil No. AW-05-2626, 2009 WL 1153397, *7-*8 (D. Md. Mar. 23, 2009); *Equal Rights Ctr. v. Camden Prop. Trust*, Civil No. PJM-07-2357, 2008 U.S. Dist. LEXIS 109894, *21-*24 (D. Md. Sept. 22, 2008), both of which appear to have relied primarily on the policy argument in the dictum in *Equity I*, 483 F. Supp. 2d at 487 n.7.

parallel to those available under comparable civil rights laws," H.R. Rep. No. 101-485, pt. 3, at 66 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 445, 489, there does not appear in the legislative history any explanation for why Congress used narrower language in creating the cause of action under Title III than it did under the preceding titles; nor has this court, nor apparently have others, found any such explanation. Nonetheless, the court is constrained by the presumption that "when 'Congress uses different language in different sections of a statute, it does so intentionally.'" *Small*, 388 F. Supp. 2d at 93 (quoting *Florida Pub. Telecomm. Ass'n v. FCC*, 54 F.3d 857, 860 (D.C. Cir. 1995) (collecting cases)). There is no apparent logic for limiting the private right of action under Title III to only a subset of persons or entities who would be permitted to sue under Titles I and II. *See id.* (observing that interpreting the remedies provision of Title III differently than the corresponding provisions of Titles I and II "results in a lack of consistency among the ADA's titles that has no apparent logic"); *Hilton Hotels Corp.*, 2009 WL 6067336 at *5 ("It is peculiar that Congress would provide a more limited right to relief under Title III of the ADA than it did under Title II."). Nonetheless, absent some basis to disregard the plain language of Title III, the court must conclude that the ERC does not have a cause of action to sue under Title III of the ADA.

### III.    The scope of the ERC's standing under the FHA

For these reasons, the ERC has shown that it has standing to sue Equity for alleged violations of the FHA, but not under the ADA. The question remains, however, whether the ERC has standing under the FHA to seek relief with respect to all 298 properties currently the subject of this lawsuit, or only a subset of those properties.[16] Equity argues that even if the ERC

---

[16] The ERC's original complaint named 300 properties allegedly in violation of the FHA. By stipulation on November 9, 2009, the ERC withdrew its allegations with respect to two properties.

has standing with respect to some Equity properties, the scope of that standing is limited, for two reasons.

First, Equity argues that the ERC's standing is limited to properties located in the Washington, D.C. area, because the ERC is based in Washington, D.C. Judge Davis rejected this argument in ruling on Equity's motion to dismiss. He explained:

> Defendants' assertion that plaintiff has suffered no injury because it is merely a "regional" organization with a mission that is "too generalized" is unavailing. Manifestly, ERC is an organization with a mission that is national in scope and breadth. This is true notwithstanding the fact that plaintiff is the successor organization of several District of Columbia-area fair housing and fair employment organizations. Indeed, defendants' argument that plaintiff is merely a "regional" entity is quaintly nostalgic in this "Age of the Internet;" defendants seem not to appreciate the irony inherent in their citation to plaintiff's website in arguing that it is an organization with only parochial, "inside-the-beltway" interests. To the contrary, the national policies in favor of equal housing opportunity which animate plaintiff's mission as it works to eradicate housing discrimination (and/or inaccessibility) against persons with disabilities evidence its core mission: to ensure "equal opportunity" through "education, counseling, advocacy, enforcement, and referral services to aid protected individuals."

483 F. Supp. 2d at 487. The more fully developed record supports that ruling. Although the ERC's office is in Washington, its mission is a national one. It does not seek merely to protect the rights of persons with disabilities in the Washington area; its mission is to combat discrimination against persons with disabilities wherever they live, and to ensure that accessible multifamily housing is available throughout the country. Indeed, the ERC expended resources sending testers to inspect Equity properties in Florida, New Jersey, Washington, California and Texas, in addition to the Washington, D.C. area. There is no basis for limiting its standing to properties located in the vicinity of its office in Washington, D.C.

Second, Equity argues that even if the ERC has standing with respect to some Equity properties, the ERC's standing is limited to properties to which the ERC sent testers. (Def.'s Mem. at 12 n.7.) In other words, Equity argues that the ERC must demonstrate that it incurred

investigation expenses with respect to each property listed in the complaint to be able to include the property in its lawsuit, and that the floor-plan review conducted by the ERC is insufficient to make that showing. Judge Davis rejected a similar argument in denying Equity's motion to dismiss. Equity had argued that the court should sever the ERC's claims with respect to each property, and transfer each claim to the federal district where the property is located. 483 F. Supp. 2d at 485. Judge Davis rejected the "fiction" that the ERC's FHA claim is actually 300 separate FHA claims. He explained:

> There is no support whatsoever for the view that under the FHA or the ADA, complaints related to each structure or property in a "design and construct" violation claim constitutes a separate and distinct claim as a matter of law. . . . It is to be recalled that violations of federal civil rights remedial legislation constitute[] a "pattern or practice" where, as alleged here, "a company repeatedly and regularly engaged in acts prohibited by the statute.

483 F. Supp. 2d at 489 (citing *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 n. 16 (1977)). This reasoning applies with equal force to the question of the scope of the ERC's standing under the FHA. Part of the ERC's mission is to ensure equal opportunities in housing for persons with disabilities. The ERC's ability to advance that mission has been perceptibly impaired by Equity's alleged nationwide practice of designing multifamily housing developments in violation of the FHA. Unlike the injury to an individual from being excluded from particular accommodations, the injury to the ERC does not arise from its inability to access Equity's housing developments. Rather, its injury arises from the resources that its mission requires that it dedicate to investigating and counteracting discrimination against persons with disabilities. The ERC has devoted substantial resources to investigating and counteracting Equity's alleged nationwide pattern or practice of violating the FHA. Although it has devoted more resources to identifying violations at some Equity properties than at others, it has devoted at least some staff time to identifying violations at every property listed in the complaint,

whether by physically inspecting the property or by inspecting floor plans of the property and cross-referencing those plans with design elements at physically inspected properties. This is sufficient to show that Equity's alleged nationwide discriminatory practices perceptibly impaired the ERC's ability to advance its mission.

## CONCLUSION

For the foregoing reasons, insofar as Equity's cross-motion for partial summary judgment concerns the ERC's standing under the FHA, it will be denied; insofar as it concerns ERC's standing under the ADA, it will be granted; and insofar as it concerns the statute of limitations, it will be denied without prejudice. Equity's motion to strike will be denied. The parties' interim sealing motions, which are unopposed, will be granted. A separate Order follows.

July 22, 2011                                    /s/
Date                                            Catherine C. Blake