**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| THE EQUAL RIGHTS CENTER | : | |
| | : | |
| | : | |
| v. | : | Civil No. CCB-06-1060 |
| | : | |
| | : | |
| EQUITY RESIDENTIAL | : | |
| | : | |

**MEMORANDUM**

The Equal Rights Center ("ERC") is a non-profit organization based in Washington,

D.C. dedicated to, among other things, ensuring equal opportunities in housing for persons with

disabilities through education, research, training, counseling, enforcement and advocacy. The

ERC has sued Equity Residential ("EQR") and ERP Operating L.P. ("ERPOP") (collectively,

"Equity"), alleging that Equity has "repeatedly and continually" designed and constructed

properties that violate the Fair Housing Act (FHA), 42 U.S.C. §§ 3601-3619, and Title III of the

Americans with Disabilities Act, 42 U.S.C. §§ 12181 *et seq*.[1]  Those violations, ERC alleges,

render the properties inaccessible to persons with disabilities.  Twelve motions are currently

pending before the court.  For the reasons discussed below, ERC's motion for partial summary

judgment (ECF No. 228) will be granted in part and denied in part; Equity's motion for partial

summary judgment (ECF No. 230) will be denied; ERC's motion to strike the affidavits of Mark

Tennison and Scott Fenster (ECF No. 251) will be denied; ERC's motion to strike the testimony

and expert report of Paul Sheriff (ECF No. 248) will be granted; ERC's motion to strike the

testimony and expert report of Dr. Alison Vredenburgh (ECF No. 249) will be granted; ERC's

---

[1] All claims under the Americans with Disabilities Act have been dismissed for want of standing. (ECF No. 158).

motion to strike the testimony and expert reports of David Kessler and Mariesha Blazik (ECF No. 250) will be granted in part and denied in part; ERC's motion to withdraw its motion for sanctions (ECF No. 255) will be granted; ERC's motion to amend/correct its reply (ECF No. 258) will be granted in part and denied in part; Equity's motion to exclude the expert report and testimony of Ken Schoonover (ECF No. 259) will be granted; Equity's motion for leave to file an opposition to the Statement of Interest of the United States (ECF No. 260) will be granted; and Equity's motion for leave to file a sur-reply (ECF No. 261) will be denied as moot.

## BACKGROUND

On April 27, 2006, the Equal Rights Center filed this lawsuit against Equity Residential and ERP Operating Limited Partnership alleging FHA and ADA violations relating to the design and construction of approximately 300 apartment complexes.  (ECF No. 1).  On June 26, 2006, Equity moved to dismiss, primarily challenging ERC's standing, but also seeking transfer of venue and severance of claims.  (ECF No. 15).  Judge Andre M. Davis—who was assigned to the case at the time—denied this motion in full.  (ECF No. 42).

On May 20, 2009, the case was reassigned.[2]  The parties were directed to file motions for partial summary judgment.  On November 10, 2009, Equity filed its motion on twelve properties on the grounds that the properties either (1) predated the effective dates of the ADA and FHA provisions at issue, or (2) were not owned by Equity when they were built.  (ECF No. 106).  On November 13, 2009, ERC filed its motion on nine properties that allegedly had FHA and ADA violations.  (ECF No. 108).

Equity filed a cross-motion for summary judgment, once again challenging ERC's standing.  (ECF No. 121).  The court stayed the pending partial summary judgment motions until

---

[2] Reassignment followed the appointment of Judge Davis to the United States Court of Appeals for the Fourth Circuit.

that standing challenge could be resolved.  (ECF No. 135).  On July 22, 2011, the court granted

Equity's cross-motion as to ERC's standing to raise the ADA claim, but denied it as to the FHA

claim.  (ECF No. 158).  At the parties' request, the court subsequently stayed the litigation to

enable the parties to engage in settlement negotiations.  Unfortunately, the negotiations were

unsuccessful, and litigation proceeded with the motions now under consideration.

On June 25, 2013, ERC filed an amended complaint.  (ECF No. 184).  Equity again

moved to dismiss and to strike ERC's pattern and practice allegations.  (ECF No. 187).  On

November 27, 2013, the court denied the motion because factual issues remained regarding

successor liability, and relief under FRCP 12(f) would have been premature.  (ECF No. 195).

The parties proposed, and the court approved, a return to the partial summary judgment process.

(ECF No. 196).

On September 16, 2014, ERC refiled its partial summary judgment motion, this time

regarding eight properties.  (ECF No. 228).  On September 17, 2014, Equity refiled its partial

summary judgment motion regarding twelve properties.  (ECF No. 230).  On October 8, 2014,

the parties filed supplemental memoranda regarding ERC's partial summary judgment motion.

(ECF Nos. 238, 239).

On November 13, 2014, ERC filed four motions to strike expert reports or testimony.

(ECF Nos. 249–51).  That same day, ERC filed a motion for sanctions for spoliation of evidence.

(ECF No. 252).  On December 22, 2014, ERC filed a motion seeking to withdraw the motion for

sanctions.  (ECF No. 255).

On January 14, 2015, ERC filed a motion to amend or correct its reply brief in support of

its partial summary judgment motion, which Equity apparently had consented to.  (ECF No.

258).  On January 27, 2015, however, Equity filed a motion for leave to file a sur-reply regarding

the statement of undisputed facts attached to ERC's pending motion to amend.  (ECF No. 261).[3]

## ANALYSIS

### I.   ERC's Motion for Partial Summary Judgment

ERC seeks summary judgment on design and construction violations at eight Equity

properties.[4]  It contends Equity,[5] or a predecessor entity, was responsible for design and

construction violations at each of these properties.  Equity, in turn, claims genuine disputes of

material fact exist as to the ownership of the properties.  Further, Equity argues, ERC asks this

court to adopt the wrong standard for assessing compliance with the FHA.  For the reasons

---

[3] ERC was granted permission to exceed the page limit on its original reply brief.  In light of the excessive page length of its original reply, and the lack of justification for adding additional pages through the proposed statement of undisputed facts, the court will deny ERC's motion to amend as it relates to the proposed statement of undisputed facts.  The court will otherwise grant the motion to amend, accepting ERC's amended reply brief without the attached statement of undisputed facts.  Accordingly, because Equity's proposed sur-reply addressed only ERC's proposed statement of undisputed facts, Equity's motion for leave to file a sur-reply will be denied as moot.

[4] ERC's motion addresses eight properties: (1) 2400 M Street ("2400 M"); (2) 1210 Massachusetts Avenue ("1210 Mass"); (3) Vintage Apartment Homes ("Vintage"); (4) Mozaic Apartments ("Mozaic"); (5) Alta Court; (6) Veridian at Silver Spring ("Veridian"); (7) Highland Glen II; and (8) West End Apartments ("West End"). Equity concedes that all eight properties subject to this motion were constructed for first occupancy after March 13, 1991. (Opp'n Pl.'s Mot. Summ. J. 3–4, ECF No. 235).

[5] Any reference to "Equity" refers to the common enterprise that is comprised of EQR and ERPOP.  For the purposes of determining liability, the court does not distinguish between EQR and ERPOP.  Any liability attributable to ERPOP may pass through to EQR.  "Principles of corporate separateness 'have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose . . . of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company.'" *United States v. Bestfoods*, 524 U.S. 51, 62-63 (1998) (quoting *Chicago, Milwaukee & Saint Paul Ry. Co. v. Minneapolis Civic and Commerce Assn.*, 247 U.S. 490, 501 (1918).  This clearly is the case with EQR and ERPOP.  "Management operates the Company and the Operating Partnership as one business. The management of EQR consists of the same members as the management of ERPOP." (Reply Mem. Supp. Pl.'s Mot. Summ. J., Form 10-K, ECF No. 247-7 at 6).  "As the sole general partner of ERPOP, EQR has exclusive control of ERPOP's day-to-day management." *Id.*  Accordingly, EQR and ERPOP are not treated as separate entities for the purposes of assessing liability.

4

discussed below, summary judgment is appropriate for a subset of noncompliant features at seven of the eight properties.[6]

## A.  Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]"  *Anderson*, 477 U.S. at 247-48.  The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor.  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015).  At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 2003)).

---

[6] Equity also alleges that ERC failed to state a claim under the FHA's design and construction provisions because it cannot satisfy a required element: an aggrieved buyer or renter who has suffered discrimination as described in 42 U.S.C. § 3604(f)(1) & (2).  This is essentially an argument about standing that the court previously rejected.  (Memorandum 19–21, ECF No. 158).  The court declines to reconsider that ruling.

**B.  Equity as a Responsible Party**

"When a group of entities enters into the design and construction of a covered dwelling, all participants in *the process as a whole* are bound to follow the FHAA. . . . In essence, any entity who contributes to a violation of the FHAA would be liable." *Balt. Neighborhoods, Inc. v. Rommel Builders, Inc.*, 3 F. Supp. 2d 661, 665 (D. Md. 1998).  In filing this action, ERC brought claims against two specific entities, EQR and ERPOP.  The parties agree ERPOP participated in the design and construction of one property at issue in ERC's motion.  For the remaining properties, Equity argues it cannot be liable for design and construction violations because neither ERPOP nor EQR was a direct participant in the design and construction process.  ERC contends Equity is liable under doctrines of veil piercing and successor liability: at each of the properties, either an Equity subsidiary or a predecessor entity played a role in the design and construction process.

**a.  Legal Standard: Piercing the Corporate Veil**

The court applies federal common law in deciding whether to pierce the corporate veil because that decision implicates an important federal interest: liability for violations of the FHA. *See United States v. Pena*, 731 F.2d 8, 12 (D.C. Cir. 1984) (explaining that courts have applied federal common law when the decision whether to pierce the corporate veil implicated a federal interest); *Thomas v. Peacock,* 39 F.3d 493, 503 (4th Cir.1994), *rev'd on other grounds,* 516 U.S. 349, 353–54 (1996) (adopting federal common law rule of veil piercing in ERISA enforcement actions).

Identifying exactly *what* standard comprises the federal common law on veil piercing is a complicated question that may depend on the federal statute involved in the case.  In *Thomas v. Peacock*, the Fourth Circuit cited approvingly the First Circuit's discussion of the issue:

> The general rule adopted in the federal cases is that 'a corporate entity may be disregarded in the interests of public convenience, fairness and equity,' . . . . In applying this rule, federal courts will look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine.

*Thomas*, 39 F.3d at 503–04 (quoting *Alman v. Danin,* 801 F.2d 1, 3–4 (1st Cir.1986)).  Under this approach, the court considers "the specific legislative policies at issue and whether piercing the corporate veil is necessary to further those policies."  *Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 27 (1st Cir. 2000).

Although *Thomas* embraces the language of a liberal approach focused on whether veil piercing furthers the policies behind a federal statutory scheme, the Fourth Circuit nonetheless approved the district court's consideration of traditional factors in its veil piercing analysis.  *See Thomas*, 39 F.3d at 504–505.  And in a maritime case, the Circuit explained that  "the question of whether to pierce the corporate veil is a fact-intensive inquiry, because 'the circumstances necessarily vary according to the circumstances of each case, and every case where the issue is raised is to be regarded as *sui generis* to be decided in accordance with its own underlying facts.'" *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 544 (4th Cir. 2013) (quoting *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681 (4th Cir.1976)).  Thus, while a court should consider the implications of veil piercing in regard to the legislative policies behind a federal statute, it should not limit its analysis to only that consideration.

What additional facts play a role in this analysis depends, as mentioned above, on the circumstances of the particular case.  For example, in *Vitol*, the Fourth Circuit focused more on traditional criteria when applying the federal common law standard in a maritime case, where a specific statutory scheme is not implicated.  In *Vitol*, the Circuit identified the following factors that may be relevant to a court's decision to pierce the corporate veil:

> [G]ross undercapitalization, insolvency, siphoning of funds, failure to observe corporate formalities and maintain proper corporate records, non-functioning of officers, control by a dominant stockholder, and injustice or fundamental unfairness. Other factors properly considered by the district court in this case include intermingling of funds; overlap in ownership, officers, directors, and other personnel; common office space; the degrees of discretion shown by the allegedly dominated corporation; and whether the dealings of the entities are at arm's length.

*Vitol, S.A.*, 708 F.3d at 544 (internal quotation marks and citations omitted).  But not all of these factors need be present for the court to pierce the corporate veil, and considering the emphasis federal common law places on the legislative policies behind federal statutes, the interests of "public convenience, fairness, and equity," *Thomas*, 39 F.3d at 503–04, likely will require fewer of these traditional factors when those policies are affected by respect for the corporate form.  In any event, there must be *some* factual circumstances suggesting an improper use of the corporate form; absent a statutory directive to the contrary, frustration of federal legislative policy alone is insufficient justification for piercing the corporate veil.  *Cf. United States v. Bestfoods*, 524 U.S. 51, 63 (1998) ("[T]he failure of the statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application of the rule that '[i]n order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law.'" (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993))).[7]

Additionally, courts should consider the possibility that where a case raises the issue of veil piercing, a closer look may reveal that the parent's involvement in activities related to the subsidiary may give rise to direct liability.  "[D]erivative liability cases are to be distinguished from those in which the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management and the parent is directly a participant in the wrong

---

[7] The court does not rely on *Bestfoods* as providing the federal common law standard for veil piercing. That case did not decide whether a state or federal standard for veil piercing applies in CERCLA cases. *Bestfoods*, 524 U.S. at 63 n.9.

8

complained of. . . . In such instances, the parent is directly liable for its own actions." *Bestfoods*, 524 U.S. at 64–65 (internal quotation marks and citations omitted).

**b. Legal Standard: Successor Liability**

The court's analysis of ERC's motion also relies on the doctrine of successor liability. The FHA is silent as to whether federal or state common law standards should apply in evaluating successor liability. Faced with a similar question, the Fourth Circuit applied a federal common law standard in evaluating liability under the Comprehensive Environmental Response, Compensation, and Liability Act, explaining "the national interest in the uniform enforcement of CERCLA and the same interest in preventing evasion by a responsible party by even legitimate resort to state law are the reasons we think the successor liability is appropriate where factually justified." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 837 (4th Cir. 1992). Congress was silent as to choice of law, and a uniform federal standard is needed for determining liability under the FHA. *Cf. Clearfield Trust Co. v. United States,* 318 U.S. 363, 366–367 (1943) (federal courts should establish federal common law when a federal statute is silent as to choice of law and the statute furthers overriding federal interests). Accordingly, this court will apply federal common law in assessing successor liability under the FHA.

"The settled rule is that a corporation which acquires the assets of another corporation does not take the liabilities of the predecessor corporation from which the assets are acquired unless one of four generally recognized exceptions are met: (1) the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) the transaction may be considered a de facto merger; (3) the successor may be considered a "mere continuation" of the predecessor; or (4) the transaction is fraudulent." *Carolina Transformer Co.*, 978 F.2d at 838.

In addition to this "traditional rule" of successor liability, the Fourth Circuit endorsed a "continuity of enterprise" theory of successor liability.[8]  Under the continuity of enterprise theory, the court looks to a series of factors in deciding whether a successor entity assumes the liabilities of its predecessor.  In the context of CERCLA, the Fourth Circuit described this test as whether the plaintiff had shown "(1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise." *Id.*  These same factors, with the obvious exception of those pertaining to production facilities and products, are appropriate in analyzing successor liability under the FHA.

### c.  Legal Standards as Applied to ERC's Motion

Relevant here is the interplay between the doctrines of successor liability and corporate veil piercing.  If a successor entity acquires liability from its predecessor, and the successor is a mere agent or instrumentality (or alter-ego) of its owner(s), the liability acquired from the predecessor may be attributed to the successor's owner(s) using veil piercing principles.  This varies the traditional veil piercing analysis wherein the court focuses on the parent–subsidiary relationship at the time of the events giving rise to the liability.  It would not be feasible in this scenario to focus on the parent–subsidiary relationship during the time period in which the initial

---

[8] While the Fourth Circuit in *Carolina Transformer* did not explicitly adopt the continuity of enterprise test as a federal standard for assessing successor liability, it did so implicitly by approving the district court's use of that test notwithstanding that North Carolina law, the relevant state law in *Carolina Transformer*, had not adopted the continuity of enterprise theory. *See Carolina Transformer Co.*, 978 F.2d at 838–41; *see also HRW Sys., Inc. v. Washington Gas Light Co.*, 823 F. Supp. 318, 326 n.4 (D. Md. 1993).

liability arose because, by its very nature as a successor entity, the subsidiary did not cause liability to accrue in the first instance.

For the purposes of assessing corporate liability in the instant case, a shift in an entity's ownership structure is the functional equivalent of a successor acquiring the assets of a predecessor entity.[9]   For several of the disputed properties, ERPOP (and sometimes other Equity subsidiaries) acquired a complete ownership interest in the property-holding entity after construction was completed.  In these instances, the post-construction property-holding entity is a *de facto* successor to the property-holding entity at the time of construction (during which time it was operated as a joint venture).  Accordingly, the court will analyze successor liability as it pertains to the post-construction property-holding entities prior to deciding whether to pierce the corporate veil of those entities and hold Equity liable for design and construction violations.

### 1.  West End

ERPOP currently owns West End and owned the property during its construction. (Aff. Scott Fenster ¶ 5, ECF No. 247-6; Opp'n MSJ 26–27, ECF No. 247-6).  Equity does not dispute that ERPOP was involved in the design and construction process at West End.  The defendants can be held liable for FHA design and construction violations at the West End.

---

[9] For example, Company A is jointly owned by Parent One and Parent Two.  Parent Two creates a new entity, Company B, of which it is the sole owner.  Company B purchases all of the assets of Company A. Company B, a wholly-owned subsidiary of Parent Two, now holds all of the assets of Company A.  It is the successor to Company A.  The same result can be achieved, however, without the creation of a new corporate entity.  If, instead of creating Company B, Parent Two acquired Parent One's ownership interest in Company A, the result would be virtually the same.  Company A would be the wholly owned subsidiary of Parent Two, holding all of the same assets.  That Parent Two chooses one method over the other should not affect its putative liability for actions attributable to Company A during the time in which it was owned by Parent One and Parent Two.

### 2. Highland Glen II

Equity may also be held liable for any violations at Highland Glen II.  During

construction, Equity owned Highland Glen II through its subsidiary GR-Highland Glen L.P.

(Aff. Scott Fenster ¶ 14, ECF No. 247-6).[10]  Equity held itself out as the developer of Highland

Glen II in both public and private documents.  (Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 23,

Mass. Housing Finance Agency Site & Project Approval Application 2, ECF No. 247-25; Reply

Mem. Supp. Pl.'s Mot. Summ. J., Ex. 24, Mem. Re: Request to Proceed with Final Construction

Documents, ECF No. 247-26).  Equity's staff reviewed change orders from the architect and

signed contracts pertaining to the property's development. (Reply Mem. Supp. Pl.'s Mot. Summ.

J., Ex. 29, Misc. Correspondence at EQR189217, ECF No. 247-31; Reply Mem. Supp. Pl.'s Mot.

Summ. J., Ex. 3, Aff. Mark Tennison ¶ 14, ECF No. 247-5).  These facts show either that the

Highland Glen subsidiaries were mere agencies or instrumentalities of Equity or, in the

alternative, that Equity itself was directly involved in the design and construction of the property.

Accordingly, Equity may be held liable for violations of the FHA in the construction and design

of Highland Glen II.

### 3. 1210 Mass

Equity can be held responsible for design and construction violations at 1210 Mass under

the continuity of enterprise theory of successor liability.  While under construction, 1210 Mass

was owned and managed by EQR-JBG 12th & Massachusetts, L.L.C., a joint venture between

ERPOP and JBG/JER 12th & Massachusetts Partner LLC. (Reply Mem. Supp. Pl.'s Mot. Summ.

J., Ex. 4, Aff. Scott Fenster ¶ 7, ECF No. 247-6).  Upon completion of construction, ERPOP

---

[10] The General Partner in GR-Highland Glen L.P. was GPT-Highland Glen LLC, the managing member of which is Grove Operating, L.P. (Aff. Scott Fenster ¶ 14, ECF No. 247-6).  All three are identified as Equity subsidiaries. (Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 6, List of Subsidiaries of Equity Residential and ERP Operating Limited Partnership 47, 49, ECF No. 247-8).

assumed its partner's interest in the joint venture. (Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 8, Assignment & Acceptance of Membership Interest, ECF No. 247-10).

Upon ERPOP's acquisition of its partner's interest, EQR-JBG 12th & Massachusetts, LLC, now an Equity subsidiary, continued the enterprise of the joint venture. The physical location and assets—namely, the apartment complex itself—are the same. So are the personnel: Equity staff visited the property to monitor progress during construction, and ERPOP designated personnel to represent its interests in the joint venture. (Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 1, Tennison Dep. 95:6-16; 97:3-18, ECF No. 247-3; LLC Agreement of EQR-JBG 12th & Massachusetts at EQR153485, ECF No. 247-13). The name of the enterprise did not change, and Equity continues to manage the property through its subsidiary, Equity Residential Management, LLC. (Aff. Scott Fenster ¶ 7, ECF No. 247-6). Further, the entity maintained its business purpose of providing multifamily residential housing. Equity has not introduced any evidence that would create a genuine dispute regarding these facts. Therefore, under the continuity of enterprise theory, any liabilities accrued while EQR-JBG 12th & Massachusetts, LLC operated as a joint venture still attach to that entity after ERPOP's consolidation of its ownership interest.

EQR-JBG 12th & Massachusetts, LLC became a subsidiary over which Equity exerted virtually exclusive control. For the purposes of determining liability, the court does not distinguish between EQR, ERPOP, or their wholly-owned subsidiaries. Equity has publicly represented that the Company—that is, "EQR, ERPOP and those entities/subsidiaries owned or controlled by ERPOP"—operates as a single unit. (Reply Mem. Supp. Pl.'s Mot. Summ. J., Form 10-K, ECF No. 247-7 at 6). "Management operates the Company and the Operating Partnership as one business. The management of EQR consists of the same members as the management of ERPOP." *Id.* "All of the Company's property ownership, development and

13

related business operations are conducted through the Operating Partnership [ERPOP]." *Id.*

This clearly shows Equity dominated the operations of its subsidiaries.  It would be

fundamentally unfair to limit liability to these entities which serve as nothing more than vehicles

for holding Equity's property assets.  Further, it would frustrate the purpose of the FHA's broad

remedial scheme to allow Equity to escape liability simply because it established separate

subsidiaries to hold each of its properties.  Accordingly, the court will pierce the corporate veil of

EQR-JBG 12th & Massachusetts, LLC, and Equity can be held liable for design and construction

violations at 1210 Mass.

**4.   2400 M**

Equity can also be held liable for design and construction violations at 2400 M under the

continuity of enterprise theory.  During construction, 2400 M was owned by EQR-JBG 2400

Residential, LLC, a joint venture in which ERPOP and JBG/2400 Residential Partner, LLC each

held a 50% ownership interest. (Aff. Scott Fenster ¶ 8, ECF No. 247-6; Reply Mem. Supp. Pl.'s

Mot. Summ. J., Ex. 12, LLC Agreement of EQR-JBG 2400 Residential at EQR154165, ECF No.

247-14).  JBG/2400 Residential Partner, LLC transferred its ownership interest to ERPOP at the

end of construction in exchange for cash and partnership interests in ERPOP. (Reply Mem.

Supp. Pl.'s Mot. Summ. J., Ex. 13, Membership Interest Transfer Agreement, ECF No. 247-15).

Upon ERPOP's acquisition of JBG's interest, EQR-JBG 2400 Residential, LLC, now an

Equity subsidiary, continued the enterprise of the joint venture.  As with the 1210 Mass joint

venture, ERPOP had to sign off on certain "Joint Decisions," including approval of the initial

construction plans and any modification to the plans or construction specifications. (LLC

Agreement of EQR-JBG 2400 Residential at EQR154187–91, ECF No. 247-14).  ERPOP

continues to manage the property through its subsidiary, Equity Residential Management, LLC.

(Aff. Scott Fenster ¶ 8, ECF No. 247-6).  The physical location and assets—namely, the

apartment complex itself—are the same.  So are the personnel: Equity staff visited the property

to monitor progress, and ERPOP designated personnel to represent its interests in the joint

venture. (Tennison Dep. 97:19–99:3, ECF No. 247-3; LLC Agreement of EQR-JBG 2400

Residential at EQR154187, ECF No. 247-14).  Equity has not introduced any evidence that

would create a genuine dispute regarding these facts.  Therefore, under the continuity of

enterprise theory, any liabilities accrued while EQR-JBG 2400 Residential, LLC operated as a

joint venture were still attributable to that entity after ERPOP's consolidation of its ownership

interest.  As EQR-JBG 2400 Residential, LLC became a subsidiary over which Equity exerted

virtually exclusive control, any liability attributed to that entity can be passed on to Equity by

piercing the corporate veil.  Accordingly, Equity can be held liable for design and construction

violations at 2400 M.

### 5. Alta Court

Equity can be held liable for design and construction violations at Alta Court under the

continuity of enterprise theory.  During construction, Alta Court was owned by Alta Pacific,

LLC, a joint venture in which ERPOP and another entity, Wood Alta Pacific LLC, each held a

50% ownership interest. (Aff. Scott Fenster ¶ 6, ECF No. 247-6; Reply Mem. Supp. Pl.'s Mot.

Summ. J., Ex. 48, Agreement of Limited Partnership of Alta Pacific Limited Partnership at

EQR025786, ECF No. 247-50).  Alta Pacific, LLC was later converted to a Limited Partnership,

Alta Pacific Limited Partnership, with the same members.  (Agreement of Limited Partnership of

Alta Pacific Limited Partnership at EQR025776, ECF No. 247-50).[11]  Wood Alta Pacific LLC

later sold its interest in the joint venture to ERPOP and EQR-Kelvin Court, LLC, another Equity

---

[11] A third entity, Pacific Housing, a California nonprofit public benefit corporation, also was listed as a
partner; however, that entity held 0% ownership interest in the partnership.  (Agreement of Limited
Partnership of Alta Pacific Limited Partnership at EQR025787, ECF No. 247-50)

subsidiary. (Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 57, Assignment and Acceptance of Partnership Interest at EQR257011, ECF No. 247-59).

Upon ERPOP's acquisition of Wood Alta Pacific, LLC's ownership interest, Alta Pacific Limited Partnership, now an Equity subsidiary, continued the enterprise of the joint venture. As with its other properties, ERPOP had a say in joint management decisions during design and construction, including approval of the initial construction plans and a say in modification of those plans or construction specifications. (Agreement of Limited Partnership of Alta Pacific Limited Partnership at EQR025817–24, ECF No. 247-50). Equity's development group monitored the construction through meetings and status reports. (Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 52, Development Group Status Notes at EQR043073, ECF No. 247-54; Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 55, Development Group Status Notes at EQR043138, ECF No. 247-57). The physical location and assets—namely, the apartment complex itself—are the same. So are the personnel: Equity staff made routine visits to the property during construction. (Tennison Dep. 98:18–99:3, 100:1–13, ECF No. 247-3). Equity manages the property today through its subsidiary, Equity Residential Management, LLC. (Aff. Scott Fenster ¶ 6, ECF No. 247-6). Equity has not introduced any evidence that would create a genuine dispute regarding these facts. Therefore, any liabilities accrued while Wood Alta Pacific, LLP operated as a joint venture still attached to that entity after Equity consolidated its ownership interest. As Wood Alta Pacific, LLP became a subsidiary over which Equity exerted virtually exclusive control, any liability attributed to that entity can be passed on to Equity by piercing the corporate veil. Accordingly, Equity can be held liable for design and construction violations at Alta Court.

### 6.  Mozaic

During construction, Mozaic was owned by LPC Union Apartments LLC, which in turn was controlled by a joint venture, EQR/Lincoln No. Five Master Limited Partnership. (Aff. Scott Fenster ¶ 10, ECF No. 247-6).  Equity had a fifty percent ownership interest in this joint venture. (Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 15, Agreement of Limited Partnership of EQR/Lincoln No. Five at EQR068243, ECF No. 247-17).  Upon completion of construction, Equity's partner in the joint venture transferred its interests in LPC Union Apartments LLC (the owner of Mozaic) to ERPOP, making ERPOP the sole owner of LPC Union Apartments LLC. (Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 21, Assignment and Acceptance of Membership and Partnership Interest at EQR257390, ECF No. 247-23).

As a wholly owned subsidiary of Equity, LPC Union Apartments LLC continued the same enterprise it operated under the control of the joint venture.  The physical location and assets—namely, the apartment complex itself—are the same.  So are the personnel: Equity staff made routine visits to the property during construction.  (Tennison Dep. 98:18–99:3, 99:18-21, ECF No. 237-3).  Additionally, Equity employees were involved in supervising the operations. Equity's development group monitored the construction through status reports, and Equity staff reviewed and approved change orders to the site plans (Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 53, Development Group Status Notes at EQR043158).  Equity has not introduced any evidence that would create a genuine dispute regarding these facts.  Therefore, any liabilities accrued while LPC Union Apartments LLC operated as a joint venture still attached to that entity after Equity consolidated its ownership interest.  As LPC Union Apartments LLC became a subsidiary over which Equity exerted exclusive control, any liability attributable to that entity

can be passed on to Equity by piercing the corporate veil. Accordingly, Equity can be held liable for design and construction violations at Alta Court.

### 7. Veridian

Equity can be held liable for design and construction violations at Veridian. During construction, Veridian was owned by Silver Spring Gateway Residential, LLC, which was in turn owned by a joint venture, EQR-JBG Silver Spring, Gateway, LLC. (Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 39, Limited Liability Company Agreement at EQR056159–60, ECF No. 247-41). ERPOP was a member of this joint venture. *Id*. Upon completion of construction, ERPOP's partner in the joint venture transferred its ownership interest to ERPOP, giving it a 99.98% ownership interest in EQR-JBG Silver Spring, Gateway, LLC.[12] (Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 44, Assignment and Acceptance of Membership and Partnership Interest at EQR257790, ECF No. 247-46). This assignment of interests included assignment of "all . . .liabilities . . . from such entity." *Id.* Accordingly, ERPOP expressly assumed any liabilities attributable to EQR-JBG Silver Spring Gateway, LLC.

The facts show that EQR-JBG Silver Spring Gateway, LLC treated its subsidiary, Silver Spring Gateway Residential, LLC, as a mere agent or instrumentality for the purposes of constructing the Veridian property. EQR-JBG Silver Spring Gateway, LLC was the sole owner of Silver Spring Gateway Residential, LLC, and decisions regarding construction were made by the members of the joint venture, including ERPOP. Equity's staff reviewed change orders, including of features relevant to accessibility such as door frame openings. (Reply Mem. Supp. Pl.'s Mot. Summ. J., Letter Dated June 5, 2009 at EQR 049507, ECF No. 247-44). The physical location and assets—namely, the apartment complex itself—are the same. So are the personnel: Equity staff made routine visits to the property during construction. (Tennison Dep. 98:18–99:3,

---

[12] The remaining .02% interest was transferred to two other Equity subsidiaries.

99:18-22, ECF No. 247-3).  Accordingly, any FHA liability Silver Spring Gateway Residential, LLC acquired as owner of Veridian during construction passed through to the joint venture, EQR-JBG Silver Spring Gateway, LLC, under corporate veil-piercing doctrines.  Because ERPOP (and other Equity subsidiaries) expressly assumed all liabilities attributable to this joint venture, it may be held liable for design and construction violations at Veridian.

### 8.  Vintage

Finally, ERC has not proffered sufficient facts to support a grant of summary judgment as to the Vintage property.  ERC points out that Vintage Ontario, LLC was formed in 2004, the year prior to construction.  (Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 34, First Amended and Restated Limited Liability Company Agreement of Vintage Ontario, LLC at EQR010170, ECF No. 247-36).[13]  It appears Vintage Ontario, LLC owned the Vintage property at the time of construction.  *Id.*  at EQR010171.  The sole member of Vintage Ontario, LLC at that time was SRG Vintage, L.P. (presumably a subsidiary of Sares Regis Group).  *Id.* at EQR010170.  After construction, EQR-Vintage I, L.L.C. acquired part of SRG Vintage, L.P.'s interest in Vintage Ontario, LLC.  *Id.*  These facts do not support a finding of successor liability as Equity, through its subsidiary, acquired only a portion of SRG Vintage, L.P.'s interest in Vintage Ontario, LLC. Further, veil piercing is inappropriate as ERC has not introduced evidence showing that Vintage Ontario, LLC was a mere agent or instrumentality of Equity.  Accordingly, there is a genuine dispute of fact as to Equity's liability, and summary judgment will be denied as to all alleged violations at Vintage.

---

[13] ERC also points to a tentative joint venture agreement between Equity, Sares-Regis Group, and a third party lender to develop the Vintage property. (Reply Mem. Supp. Pl.'s Mot. Summ. J., Ex. 30, Preliminary Investment Memorandum at EQR088739, ECF No. 247-32).  It offers no evidence, however, showing that Equity held an ownership interest in the property at the time of construction or, for that matter, that the joint venture agreement was finalized.

### C.  Liability for Violations

The court must next assess whether summary judgment is proper as to the allegedly noncompliant elements at the remaining seven properties.  The answer rests largely on the legal standard for determining compliance with the FHA's design and construction provisions.  For the reasons discussed below, the court applies an objective standard and finds that summary judgment is warranted as to certain elements at the seven properties.

#### a.  Statute and Regulations

ERC alleges Equity violated the accessibility "design and construction" provisions of the Fair Housing Act.  The FHA prohibits certain forms of discrimination in covered multifamily dwellings.  *See* 42 U.S.C. § 3604(f)(1) (making it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any [current or future] buyer or renter because of a handicap").  Section 3604(f)(3)(C) defines discrimination as:

> a failure to design and construct [covered multifamily] dwellings in such a manner that--
>
>> (i) the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons;
>>
>> (ii) all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and
>>
>> (iii) all premises within such dwellings contain the following features of adaptive design:
>>
>>> (I) an accessible route into and through the dwelling;
>>>
>>> (II) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;
>>>
>>> (III) reinforcements in bathroom walls to allow later installation of grab bars; and

> (IV) usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

*Id.* § 3604(f)(3)(C).  In providing this mandate, Congress did not define many of the statute's key terms, including what makes a property "accessible" or inclusive of "adaptive design," and the statute provides few specific methods to show compliance.  First, "[c]ompliance with the appropriate requirements of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as 'ANSI A117.1') suffices to satisfy the [adaptive design] requirements." *Id.* § 3604(f)(4).  Additionally, compliance with a state or local building code which incorporates section 3604(f)(3)(C) satisfies the FHA's design and construction requirements.  *Id.* at § 3604(f)(5).  In lieu of specifics, Congress granted the Secretary of HUD authority to provide states with technical guidance in incorporating these changes, *id.* § 3604(f)(5)(C), and, more importantly, gave the agency authority to "make rules . . . to carry out this subchapter."  *Id.* § 3614a.

In response to this mandate, HUD promulgated regulations implementing the FHA and clarifying some of its key terms.  *See* 24 C.F.R. § 100.200 *et seq.*  The regulations identify the Fair Housing Accessibility Guidelines ("the guidelines")[14] and a list of recognized safe harbors as the primary methods of showing compliance with the FHA's design and construction requirements. *See* 24 C.F.R. § 100.205(e).  The regulations further provide that "[c]ompliance with any other safe harbor recognized by HUD in the future and announced in the Federal Register will also suffice to satisfy the requirements of" the FHA's design and construction provisions.  *Id.* § 100.205(e)(3).  Additionally, the regulations mirror the FHA by recognizing

---

[14] The guidelines, first issued by HUD on March 6, 1991, provide technical guidance for the design and construction of multifamily dwelling units.  *See* Final Fair Housing Accessibility Guidelines, 56 Fed. Reg. 9,472 (March 6, 1991).

compliance when a property satisfies a state or local building code that incorporates the Act's design and construction requirements.[15]  *Id.*  § 100.205(f).

### b.  The Parties' Arguments

The parties disagree as to the correct legal standard for reviewing alleged violations of the FHA's design and construction provisions.  ERC initially took a position that HUD first adopted in administrative enforcement proceedings.[16]  *See* Order on Secretarial Review, U.S. Department of Housing and Urban Development and Montana Fair Housing, Inc. v. Brent Nelson, HUD ALJ 05-068FH (September 21, 2006) (2006 WL 4573902).  According to HUD, a prima facie case of design and construction violation may be established by showing a property has relevant features that do not comply with the Guidelines.  *Id.* ("The Charging Party may establish a *prima facie* case by proving a violation of the Guidelines.")  If the plaintiff establishes this prima facie case, the defendant can escape liability if it shows "compliance with a recognized, comparable, objective measure of accessibility." Design and Construction Requirements; Compliance with ANSI A117.1 Standards, 73 Fed. Reg. 63,614 (Oct. 24, 2008).[17]

Equity rejects ERC's formulation, dismissing it as nonbinding because it was first articulated in an administrative proceeding, and nothing in the FHA grants HUD the authority to alter the normal burden of persuasion allocation in an Article III judicial proceeding.  (Opp'n Pl.'s Mot. Summ. J. 16, ECF No. 235).  Instead, Equity urges the court to consider whether ERC has shown "that each of the Eight [properties] is inaccessible and unusable (an avenue ERC has

---

[15] The regulations do not, however, specify *which* state or local building codes fall within this category.

[16] ERC's reply memorandum offers a position closer to that which the court adopts today.  (Reply Mem. Supp. Pl.'s Mot. Summ. J 24–26, ECF No. 247).

[17] The United States filed a statement of interest in this case, encouraging this court to affirm that approach.  (ECF No. 245).  Equity seeks leave to file an opposition to the statement of interest filed by the United States.  The court will grant leave to file and considers the opposition brief attached to that motion.

not pursued), and lacks features of adaptive design for making areas accessible through quick, simple and inexpensive modifications." *Id.*

Simply put, Equity argues for a subjective analysis of accessibility/usability, which may be satisfied by the ability to make a property compliant after a request is made, over ERC's position that the design and construction requirements can only be met through compliance with an objective standard that is satisfied at the time of design and construction.

### c. Choosing a Standard

Selecting the correct legal standard requires first identifying how a plaintiff can show a violation of section 3604(f)(3)(C). *See Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014) ("The burden is on the plaintiff to establish each element" of his claim.). The FHA does not define "accessible," "accessible route," or "adaptive design," or any other requirement of the design and construction provisions. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the [interpreting] agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). Thus, the court looks to the meaning provided by HUD. *See Meyer v. Holley*, 537 U.S. 280, 287 (2003) (naming HUD as "the federal agency primarily charged with the implementation and administration of the" FHA and specifying that courts "ordinarily defer to an administering agency's reasonable interpretation of a statute").

In defining "accessible" and "accessible routes," HUD specifies that a property meets these requirements when its features comply with a specific ANSI standard or other "comparable standard." 24 C.F.R. § 100.201. Neither definition suggests accessibility may be shown through the type of subjective analysis proposed by Equity. Further, as noted above, HUD's

implementing regulations repeatedly point to only *objective* methods of compliance with the FHA's design and construction provisions.

The design and construction provisions are intended to ensure that a property will be accessible for all prospective disabled tenants. Objective standards provide clear guidance on how to comply with these requirements; conversely, requiring a plaintiff to make an ill-defined subjective showing of inaccessibility—that is, allowing a defendant to escape liability simply by showing that *some* disabled persons can access a property—cuts against the "broad remedial intent of Congress embodied in the [FHA]." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982). Given Congress's silence on this issue and the reasonableness of HUD's interpretation, an objective standard is appropriate for resolving FHA design and construction cases.

The next step, then, is identifying the correct objective standard. As an initial matter, the court is not persuaded by Equity's assertions that ERC's proposal impermissibly shifts the burden of persuasion. Equity is correct that "[w]here the statutory text is 'silent on the allocation of the burden of persuasion,' we 'begin with the ordinary default rule that plaintiffs bear the risk of failing to prove their claims.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) (quoting *Schaffer v. Weast,* 546 U.S. 49, 56 (2005)); *see also Hollis*, 760 F.3d at 544 ("[T]he Supreme Court repeatedly has cautioned the courts not to shift the burden of persuasion absent a clear statement of congressional intent . . . ."). ERC's position, contrary to Equity's assertions, does not violate this principle. In the framework adopted by HUD, "the burden of persuasion remained with the [plaintiff] and only the burden of production shifted to the [defendant]." *Nelson v. U.S. Dep't of Hous. & Urban Dev.*, 320 F. App'x 635, 638 (9th Cir. 2009).

The court adopts the following approach. Recognizing that the FHA's implementing regulations discuss multiple objective standards in addition to the guidelines which may satisfy

the statute's design and construction requirements, ERC may satisfy its burden of persuasion initially by identifying features that fail to comply with any of the objective standards currently recognized in the Federal Register.  Equity may still defeat summary judgment by raising a genuine dispute of fact as to whether the features comply with an existing objective standard, compliant state or local building code, or some other "comparable standard"; however, subjective assertions of accessibility and compliance will not alleviate design and construction liability.[18]

Finally, to establish a violation of the FHA, ERC need not show a violation of *each* design and construction requirement in section 3604(f)(3)(C).  A single violation may give rise to a successful claim under the FHA.[19]  *See, e.g.*, *Balt. Neighborhoods, Inc. v. LOB Inc.*, 92 F. Supp. 2d 456, 463 (D. Md. 2000) (finding liability for violation of reinforced wall requirement of 42 U.S.C. § 3604(f)(3)(C)(iii)(III)); *Balt. Neighborhoods, Inc. v. Rommel Builders, Inc.*, 40 F. Supp. 2d 700, 714 (D. Md. 1999) (denying summary judgment as to one particular design and construction requirement because defendants had shown a genuine issue of material fact as to

---

[18] This rule is not, as Equity contends, a shifting of the burden of persuasion; rather, it is an expression of the typical summary judgment standard – that a "party opposing a properly supported motion for summary judgment [must rely on more than] the mere allegations or denials of his pleadings." *Bouchat v. Balt. Ravens Football Club, Inc.*, 364 F.3d 514, 525 (4th Cir. 2003).  It would not be feasible to require a plaintiff seeking summary judgment to show a defendant's noncompliance with every possible standard not listed in the HUD regulations or otherwise widely embraced in FHA proceedings.  Accordingly, if Equity would like the protection of some other standard, it must at least identify that standard and show its comparability and applicability to the instant case.

[19] "The FHA mandates the inclusion of seven specified accessibility features, not a certain percentage of their perceived subsidiary elements. Thus, it is quite possible for a development to be found in violation of each FHA requirement even though it complies with over eighty percent of the subsidiary elements surveyed in the HUD study. Furthermore, § 3604(f)(3)(C) requires that all seven of its requirements be included; it is no defense in an individual case for a developer to show that its building complies with some, or even most, of these requirements." Robert G. Schwemm, Barriers to Accessible Housing: Enforcement Issues in "Design and Construction" Cases Under the Fair Housing Act, 40 U. Rich. L. Rev. 753, 770 (2006).

only that feature).  Accordingly, Equity may be liable for violations at a property even where not all of the requirements of section 3604(f)(3)(C) are implicated.

### d.  Violations at The Seven Remaining Properties

ERC has established certain design and construction violations at the seven remaining properties.  These violations notwithstanding, genuine issues of material fact remain as to other allegedly noncompliant features.  Accordingly, the plaintiff's motion for partial summary judgment will be granted in part and denied in part.

ERC relies heavily on its expert, Phillip Zook.  Zook's report lays out numerous instances where features at each property do not satisfy the HUD Guidelines or any other currently recognized safe harbor.  (Pl.'s Mot. Summ. J., Zook Report, ECF Nos. 228-13 to 228-22). Equity's experts, David Kessler and Mariesha Blazik, disagree with Zook's measurements and/or classification of a number of these features, disputing his conclusion that they fall outside the Guideline range or some other safe harbor.  There is a genuine dispute of material fact as to those features.  Accordingly, summary judgment will be denied as to features that Equity's experts contend satisfy a recognized safe harbor.

There are several features at each property that Equity's experts concede fall outside the ranges provided for in the HUD Guidelines or some other recognized safe harbor.  They offer unsupported assertions of compliance with state building codes and raise arguments the court finds irrelevant or unsupported.  These arguments are thus not appropriate for consideration in deciding this motion for summary judgment.  Having conceded that certain features fall outside any recognized safe harbor, Equity's expert does not create a genuine dispute of fact over whether they satisfy section 3604(f)(3)(C).  Accordingly, summary judgment will be granted as to Equity's liability for any violation that both parties' experts concede fall outside a safe harbor.

**II.        Equity's Motion for Partial Summary Judgment**

Equity seeks summary judgment on twelve properties at issue in this litigation on the grounds that each of these properties either (1) was built before the effective date[20] of the FHA's design and construction provisions, or (2) was not built or designed by Equity.  ERC concedes that four properties were built before the effective date and that six of the remaining properties were not built or designed by Equity.  ERC instead argues that Equity is subject to liability for two of the properties at issue in Equity's motion, "Madison at Chase Oaks" and "Lakeshore at Preston," based on the doctrines of piercing the corporate veil or successor liability.[21]

The relevant legal standards for piercing the corporate veil and successor liability are laid out in the court's discussion of ERC's motion for partial summary judgment.  In addition to those standards, the court explains here the de facto merger test as ERC focuses on that exception in arguing for successor liability regarding Lake Shore at Preston.  De facto merger is an equitable doctrine through which the court may find a successor entity liable for the actions of its predecessor if some combination of the following occurs: "(1) continuity of management, personnel, physical location, assets, and general business operations (i.e., continuity of enterprise); (2) continuity of ownership; (3) prompt cessation of the seller corporation's operations; and (4) assumption by the purchaser of obligations ordinarily necessary for the uninterrupted continuation of normal business operations of the seller." *HRW Sys., Inc.*, 823 F. Supp. at 334 (quoting *Crawford Harbor Assoc. v. Blake Const. Co.,* 661 F. Supp. 880, 884 (E.D. Va. 1987)).

---

[20] Properties constructed for first occupancy prior to March 13, 1991, are not required to comply with the FHA's design and construction provisions.  24 C.F.R. § 100.205(a).

[21]Equity contends these properties have since been sold.  While this may preclude injunctive relief, Equity offers no reason why this precludes finding Equity liable for compensatory and punitive damages, if otherwise justified, for design and construction violations. *See* 42 U.S.C. § 3613(c).

### A.  Madison at Chase Oaks

Equity seeks a determination that it cannot be held liable for any design and construction

violations at Madison at Chase Oaks ("Madison") because it acquired Madison after it was built

by another entity.  The original owner of Madison was Jefferson Oaks at Chase, L.P.  The two

partners in that entity, JPI Investment Company, LP, and Carmil Capital Corporation, sold their

partnership interest in November 1995 to ML Apartments Limited and Merry Land Apartment

Communities, Inc., both subsidiaries of Merry Land and Investment Company, Inc ("Merry Land

& Investment").  (Opp'n Defs.' Mot. Summ. J., Ex. C, Compromise, Settlement Agreement &

Mutual Release at EQR02099–2127, ECF No. 236-4; Defs.' Mot. Summ. J., Ex. A, Mason Aff. ¶

8, ECF No. 230-2).  Accordingly, Jefferson Oaks at Chase, L.P., was a subsidiary of Merry Land

& Investment when it merged with ERPOP in October of 1998.  (Opp'n Defs.' Mot. Summ. J.,

Ex. D, Partnership Aff., ECF No. 236-5; Opp'n Defs.' Mot. Summ. J., Ex. E, Form 8-K, ECF

No. 236-6; Reply Supp. Defs.' Mot. Summ. J. 7, ECF No. 246).

ERC points to enough evidence to create a genuine dispute of material fact as to Equity's

potential derivative liability for design and construction violations at Madison.  The contract for

the sale of the partnership interest in Madison's owner, Jefferson Oaks at Chase, L.P., provided

that Merry Land & Investments would "form a wholly owned subsidiary (Newco I) to purchase

the general partner interest" and also "form a second wholly owned subsidiary (Newco II)to

purchase the limited partner interest." (Opp'n Defs.' Mot. Summ. J., Ex. C, Sales Contract at

EQR02099–2100, ECF No. 236-4).  The contract further provided that Merry Land &

Investments would "cause Newco I to buy . . . the General Partner Interest" and "cause Newco II

to buy . . . the Limited Partner Interest." *Id.*  On two different forms, one providing for

repairs/adjustments to the design and construction of the property, the same individual, Michael

N. Thompson, signed on behalf of Merry Land & Investment as well as Merry Land Apartment Communities, Inc. and ML Apartments Limited. *Id.* at EQR02090–91, EQR02608. He is listed as a Vice President for each of these entities. *Id.*

These documents show, at the very least, the involvement of one of these Merry Land entities in the design and construction of Madison; the court need not decide which entity in ruling on Equity's motion. Thompson's signature suggests either direct involvement by Merry Land & Investments, or one of the Merry Land subsidiaries, in the design and construction of Madison. Direct involvement of Merry Land would render it liable or, if the subsidiaries were directly involved, the facts suggesting an overlap of officers and total control by Merry Land & Investments over the affairs of the subsidiaries create at least a genuine dispute of fact as to whether the corporate veil should be pierced and the subsidiaries' liability attributed to Merry Land & Investment. Thus, regardless of which of these entities was actually approving changes to the design and construction process, the liability therefrom may be attributed to Merry Land & Investment.

In 1998, Merry Land & Investment merged with ERPOP. "Upon the consolidation or merger of two corporations, the transferee or successor corporation remains fully liable for the liabilities of the transferor corporation." *R.C. McEntire & Co. v. E. Foods, Inc.*, 702 F.2d 471, 474 (4th Cir. 1983); *see also* 15 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations § 7082 ("When corporations merge, the surviving corporation succeeds to both the rights and obligations of the constituent corporations.").[22] Accordingly, if Merry Land & Investment itself was liable for FHA violations, ERPOP acquired that liability through the

---

[22] Equity does not challenge this proposition, nor has it pointed to any law governing the merger that would require the court to reach a different conclusion.

merger.  Because these facts reasonably could lead to holding Equity liable for FHA violations at Madison, summary judgment will be denied as to this property.

## B.  Lake Shore at Preston

Equity seeks a determination that it cannot be held liable for design and construction violations at Lake Shore at Preston ("Lakeshore").  In January 1998, ERPOP and an EQR subsidiary, EQR-Lakeshore at Preston Limited Partnership ("EQR-Lakeshore"), entered into a contract to acquire the property from its then-owner, Lakeshore at Preston Partners ("Lakeshore Partners").  ERC contends this agreement evinces a de facto merger wherein ERPOP assumed the liabilities of Lakeshore Partners.

ERC points to several facts in the record that could suggest a de facto merger between ERPOP[23] and Lakeshore Partners.  (Opp'n Defs.' Mot. Summ. J. 16–18, ECF No. 236).  The residential apartment business at the property continued to operate (Opp'n Defs.' Mot. Summ. J., Ex. F, Closing Book at EQR05084, ECF No. 236-7); there was an exchange of shares in ERPOP as part of the compensation for the purchase of the Lakeshore Property (Closing Book at EQR05080, ECF No. 236-7); the Partnership ceased to operate (Opp'n Defs.' Mot. Summ. J., Ex. F, Lakeshore at Preston Partners Partnership Agreement at EQR05422, ECF No. 236-7); and Equity assumed responsibility for ongoing leases at the property (Closing Book at EQR05084, ECF No. 236-7).  Accordingly, genuine issues of material fact preclude summary judgment as to the Lakeshore property, and Equity's motion will be denied.

---

[23] Equity makes much of the fact that EQR-Lakeshore, rather than ERPOP, was the entity that acquired title to the Lakeshore property.  This focus is misplaced.  ERPOP's putative liability does not rest on its post-construction acquisition of the allegedly infringing property; rather, it hinges on the purported de facto merger with Lakeshore Partners, the entity that may have acquired liability during the design and construction process.

### III.     ERC's Motion to Strike Affidavits of Tennison and Fenster

ERC moves to strike the affidavits of Mark Tennison and Scott Fenster submitted in

support of Equity's opposition to the plaintiff's motion for partial summary judgment.  ERC

alleges neither Tennison nor Fenster, despite their respective roles as Executive Vice President

for Development and Senior Vice President of Legal, had personal knowledge supporting the

content of their affidavits in violation of Rule 56(e) of the Federal Rules of Civil Procedure.

"Federal Rule of Civil Procedure 56(e) specifically requires that affidavits submitted on

summary judgment contain admissible evidence and be based on personal knowledge."  *Evans v.*

*Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).  A court may properly

consider an affidavit when the affiant "is making statements based on his personal knowledge of

the business records of the [defendant]."  *Warwick Corp. v. Md. Dep't of Transp.*, 573 F. Supp.

1011, 1015 (D. Md. 1983).

The affidavits in question were prepared and executed in 2010.  (Opp'n. Pl.'s Mot.

Summ. J., Tabs 1 & 2, Affidavits of Mark Tennison & Scott Fenster, ECF Nos. 235-3, 235-4).

Fenster and Tennison stated under oath that they had personal knowledge of the matters set forth

in their affidavits.  *Id.*  ERC cites deposition testimony from 2014 purporting to reveal

admissions by both men that they lacked such personal knowledge. (Mem. Supp. Mot. Strike 2–

3, ECF No 251-1; Reply Mem. Supp. Mot. Strike 5–8, ECF No. 268).  The court is not

convinced the testimony is as clear cut as ERC suggests.  The depositions were taken several

years after Fenster and Tennison signed their affidavits.  The natural fading of memories was the

more likely culprit for their inability to answer opposing counsel's detailed inquiries during the

2014 deposition than the possibility that Fenster and Tennison purposefully misled the court

when they attested to the truthfulness of their affidavits.  The court is satisfied that, as high-level

employees in Equity's Development and Legal departments, Fenster and Tennison may be assumed to possess the personal knowledge that comes from having access to and reviewing the relevant business records.  Indeed, the accuracy of their affidavits is bolstered by the numerous supporting documents turned over during discovery.  (*See* Opp'n Mot. Strike 8 & n.4, ECF No. 262).  Accordingly, the plaintiff's motion to strike the affidavits of Mark Tennison and Scott Fenster will be denied.

## IV.     ERC's Motions to Exclude Expert Reports and Testimony

On the same day it filed its motion for partial summary judgment, ERC moved to strike the expert reports and proposed testimony of four Equity experts: Paul Sheriff, Dr. Alison Vredenburgh, David Kessler, and Mariesha Blazik.  ERC raises challenges under Rule 26 of the Federal Rules of Civil Procedure and Rule 702 of the Federal Rules of Evidence.

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert testimony, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The party seeking to introduce expert testimony has the burden of establishing its admissibility by a preponderance of the evidence.  *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 592 n. 10 (1993).  A district court is afforded "great deference ... to admit or exclude expert testimony under *Daubert." TFWS, Inc. v. Schaefer,* 325 F.3d 234, 240 (4th Cir.2003) (citations and internal quotation marks omitted); *see also Daubert,* 509 U.S. at 592–95 ("The inquiry envisioned by Rule 702 is ... a flexible one ...."). "In applying *Daubert,* a court evaluates the

32

methodology or reasoning that the proffered scientific or technical expert uses to reach his conclusion; the court does not evaluate the conclusion itself," *Schaefer,* 325 F.3d at 240, although "conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).  In essence, the court acts as gatekeeper, only admitting expert testimony where the underlying methodology satisfies a two-pronged test for (1) reliability and (2) relevance.  *See Daubert,* 509 U.S. at 589.

### A.  Motion to Strike Expert Report and Testimony of Paul Sheriff

The court finds Paul Sheriff's report and proposed testimony irrelevant to the central issue of liability for design and construction violations.  "Rule 702 further requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue. This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotation marks and citations omitted).  Mr. Sheriff's testimony and report is admittedly limited to his particular "roll-through" method and his corresponding subjective opinions on "accessibility."  (Mot. Strike, Ex. A, Decl. & Reports of Paul Sheriff, ECF No. 248-4).  He does not opine on Equity's adherence to objective standards.  As discussed above, compliance with the FHA's design and construction requirements can only be shown by reference to recognized safe harbors or some other comparable objective standard.  Mr. Sheriff's report is therefore not relevant in determining whether the properties at issue comply with the design and construction provisions.  His subjective experience with each property will not aid the trier of fact in understanding whether the properties conform to existing standards or comparable alternatives.

Accordingly, the motion to exclude Mr. Sheriff and his report will be granted as to the question of liability.[24]

**B. Motion to Strike the Expert Report and Testimony of Dr. Alison Vredenburgh**

The court finds Dr. Vredenburgh's report and proposed testimony irrelevant to the central issue of liability for design and construction violations. Dr. Vredenburgh did not apply guidelines or safe harbors in conducting her analysis. Dr. Vredenburgh conceded, in conducting her review of the properties, "[w]e're not comparing to Safe Harbors, which are the specifications that would be included." (Mot. Strike, Ex. 1, Vredenburgh Dep. 34:12-37:5, ECF No. 249-4). Nor did she "use any other publicly available standard" in finding the properties to be accessible. *Id.* Thus, for the same reasons as Mr. Sheriff, Dr. Vredenburgh's testimony is not relevant to determining whether the properties violate the FHA's design and construction requirements. The motion to exclude Dr. Vredenburgh and her report will be granted as to the question of liability.

**C. Motion to Strike the Expert Reports and Testimony of David Kessler and Mariesha Blazik**

The court finds portions of Kessler and Blazik's reports and proposed testimony are relevant and will assist the trier of fact in determining liability. Unlike Sheriff and Dr. Vredenburgh, Kessler and Blazik address compliance with objective standards—be they the "safe harbors" or some other "comparable standard." ERC nonetheless moves to strike the

---

[24] As Sheriff's report and testimony is irrelevant to the question of liability, the court need not consider ERC's other arguments under FRCP 26 (namely, that Sheriff failed to disclose the basis for his opinions and offered only conclusory opinions) and FRCP 702. The same applies to consideration of Dr. Vredenburgh's report and testimony. Further, while not useful in determining liability for design and construction violations, Sheriff's report and testimony, along with that of Equity's other experts, may well be of assistance in crafting a remedy. Accordingly, today's rulings on Equity's experts are limited to the determination of liability.

reports and testimony of both pursuant to Rule 702 of the Federal Rules of Evidence and Rules 26 and 37 of the Federal Rules of Civil Procedure.[25]

Kessler inspected elements noted in the Zook Report at five Equity properties.  His task was to "[c]onfirm the location and conditions [Zook] describes," confirm that Zook only marked violations "when that feature did not comply with any of the HUD-approved safe harbors," and assess whether an element not in compliance with a HUD-approved safe harbor otherwise "demonstrate[s] compliance with the requirement of 24 CFR [§] 100.205 through compliance through an alternate means such as by complying with a comparable standard."  (Mot. Strike, Ex. A, Decl. & Reports of David Kessler 5, ECF No. 250-3).  Blazik conducted the same inquiry at four other Equity properties[26] and also looked to whether any allegedly noncompliant elements fell within industry-accepted "construction tolerances"[27] or met the terms of settlement agreements and consent decrees in previous cases initiated by ERC or the United States.  (Mot. Strike, Ex. D, Decl. & Reports of Mariesha Blazik 5–6, ECF No. 250-6).

As discussed above, Kessler and Blazik dispute Zook's measurements and classification of a number of features, rejecting Zook's conclusion that they fall outside the safe harbors or some other comparable objective standard.  Nonetheless, at each of the properties, Kessler or Blazik conceded that certain features fell within none of the recognized safe harbors or

---

[25] ERC's Rule 26 arguments (namely, that Kessler and Blazik did not disclose the foundation for some of their opinions) are unconvincing as to any testimony by Kessler or Blazik on whether a feature complies with an existing safe harbor.  They have similar backgrounds and experience as ERC's expert, Philip Zook, and their assertions that certain elements actually comply with the safe harbor requirements are easily verifiable.

[26] One of these properties, Bella Vista Apartments, is no longer subject to the plaintiff's motion for partial summary judgment.

[27] As to features that comply with a "construction tolerance," those tolerances specified in a safe harbor (e.g. an ANSI standard) will be considered.  The court will not consider, however, assertions of compliance with vague "industry accepted" tolerances.

comparable standards, though both added that many of these features may be accessible with or without minor adaptations.

Much of Kessler and Blazik's reports and potential testimony does not meet the Federal Rules of Evidence's relevance requirement.  *See* Fed. R. Evid. 401, 402, & 702(a).  The following aspects of their reports and testimony will be excluded from consideration in deciding liability in this case:

(1) Any statement, reference, or opinion by Blazik or Kessler addressing settlement agreements or consent decrees in other cases.  Nothing in the FHA or the HUD regulations interpreting it suggest that compliance with the design and construction provisions may be satisfied by reference to a settlement agreement or consent decree. Simply because ERC or the Justice Department settled for a remediation outside the safe harbors does not mean the government officially adopted that position as satisfying the design and construction requirements.  "Such a compromise and product of bargaining skill between two parties cannot be deemed to be an 'order or opinion' of either of the parties."  *Eirhart v. Libbey-Owens-Ford Co.*, 616 F.2d 278, 281 (7th Cir. 1980). Accordingly, any references to such agreements, and opinions based thereon, are irrelevant and will not be considered in determining liability.

(2) Both Blazik and Kessler discuss how certain noncompliant elements may still be "usable" or "accessible" by persons with disabilities.  Each further opines that several features may become accessible with relatively minor adjustments.  As discussed above, the relevant standard is whether a feature complies with a HUD-recognized safe harbor or other comparable objective standard.  Such speculation as to the usability or adaptability of noncompliant features has no relevance to ascertaining liability in a design and

construction case.  Accordingly, any such discussion of usability by either Blazik or Kessler will be excluded from consideration in determining liability.

(3) For similar reasons, neither Blazik nor Kessler's speculation on Equity's efforts and attempts to achieve compliance meets the Rules' relevance requirement.  The defendants' purported attempts at compliance do not factor into a determination of whether a property feature satisfies a recognized safe harbor or other comparable objective standard; nor does it affect a party's liability for that noncompliant feature. Accordingly, any such discussion of Equity's attempts at compliance is excluded from consideration in determining liability.

(4) Blazik and Kessler also speculate that accessible alternatives existed for certain noncompliant features at the properties; however, neither expert used measurements or an objective standard to explain why those alternatives were accessible.  The reports lack "sufficient facts or data" to support these assertions because compliance with the design and construction requirements is measured via objective standards; accordingly, this testimony will be excluded from consideration pursuant to Rule 702's reliability requirement.

(5) Blazik and Kessler each contend that certain allegedly noncompliant elements satisfy a comparable state building code.  To be reliable, the experts' conclusion of comparability in the state codes must be based on more than unsupported assertions.  Neither expert offered more than general statements of comparability.  Accordingly, there is not "sufficient facts or data" to determine that Blazik and Kessler's testimony as to the state codes is sufficiently reliable.  This testimony will be excluded from consideration pursuant to Rule 702.

**V.      Equity's Motion to Exclude Report and Testimony of Ken Schoonover**

Equity protests ERC's late filing of a new expert report attached to its reply brief in support of the partial summary judgment motion analyzed above.  It seeks exclusion of Ken Schoonover's report and testimony pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure.  Rule 26(a)(2)(A) requires a party to disclose expert witnesses it may use at trial.  The Rule provides that "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), [it must be disclosed] within 30 days after the other party's disclosure."  Fed. R. Civ. P. 26(a)(2)(D)(ii).  "Rule 37(c)(1) provides that '[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed.' . . . It is the burden of the party facing sanctions to show that the failure to comply was either substantially justified or harmless." *Carr v. Deeds*, 453 F.3d 593, 602 (4th Cir.2006) (quoting Rule 37(c)(1)), *abrogated on other grounds by Wilkins v. Gaddy,* 559 U.S. 34 (2010).  ERC did not timely disclose the identity or report of Ken Schoonover; accordingly, Equity's motion to exclude his report and testimony will be granted.

The parties in this case first disclosed their respective experts in 2010, when motions for partial summary judgment were first filed in this case.  ERC thus had access to the reports and identities of Equity's planned expert witnesses.  ERC's primary expert, Philip Zook, subsequently passed away; however, ERC never requested leave of the court to find a replacement expert or to use new expert testimony to rebut the findings of Equity's experts.  Instead, ERC attached this new expert report to its reply brief—over four years after the initial disclosure of Equity's experts.  ERC has not shown adequate justification for this court to

consider Mr. Schoonover's report or testimony.  Considering the untimely death of Mr. Zook, however, the court is not prepared to permanently deny ERC the use of Mr. Schoonover's testimony.  Accordingly, Equity's motion will be granted and the report and testimony of Mr. Schoonover will be excluded without prejudice.  ERC may, with good cause, seek to reintroduce Mr. Schoonover's report and testimony at a future stage of this litigation.

## VI.    Remaining Motions

ERC filed a motion for sanctions for spoliation of evidence on November 13, 2014, and subsequently filed a motion on December 22, 2014, seeking to withdraw the motion for sanctions.  The court will grant ERC's motion to withdraw.

## CONCLUSION

For the reasons discussed above, the court will issue an order resolving all pending motions in this case.

A separate order follows.

__March 31, 2016__                                      _____/S/_____
Date                                                                Catherine C. Blake
                                                                       United States District Judge